**Donald BINDER, Plaintiff–Appellant,**

v.

**LONG ISLAND LIGHTING COMPANY, Defendant–Appellee.**

**No. 838, Docket 90–7815.**

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1991.

Decided May 22, 1991.

Lawrence C. Downes, New York City (Gilroy Downes & Horowitz, New York City, of counsel), for plaintiff-appellant.

Mindy S. Novick, Hicksville, N.Y. (Cynthia R. Clark, Hicksville, N.Y., of counsel), for defendant-appellee.

Before KEARSE, WINTER and ALTIMARI, Circuit Judges.

WINTER, Circuit Judge:

Donald Binder, a former employee of Long Island Lighting Company ("LILCO"), claims that he was forced to accept early retirement because of age discrimination. Based on affidavits from various witnesses, the district court granted summary judgment in favor of LILCO, and Binder appealed. We reverse on the ground that Binder has produced unrebutted evidence sufficient to allow a jury to find in his favor.

## BACKGROUND

In 1955, Binder graduated from college with a bachelor's degree in mechanical engineering and went to work for LILCO. In

1969, shortly after earning a master's degree in nuclear engineering, he began supervising the construction of the Shoreham Nuclear Power Station. In 1970, he became the first project engineer for Shoreham, a position that involved him in management decisions regarding the plant's size, configuration and equipment. In 1972, he was promoted to manager of LILCO's nascent nuclear engineering division and, after the division was given departmental status in 1978, became department manager, serving in that capacity for another six years. In April 1984, he was transferred to the post of Assistant to the Vice President of Nuclear Operations. A few months later, in December 1984, he became Consulting Engineer to the Vice President of Engineering and Administration, Dr. Matthew Cordaro.

The mid–1980's were difficult years for LILCO. By 1984, when William Catacosinos took over as LILCO's Chairman and Chief Executive Officer, the company's costly efforts to license and operate the Shoreham facility had rendered its financial condition perilous. According to his affidavit in support of LILCO's motion for summary judgment, Catacosinos employed a "hands-on" management style, under which decisions of any significance, including staffing levels and individual placement decisions, required his personal approval. In addition, he tried to make the company's bureaucracy leaner by laying off more than five hundred employees. Finally, he decided to eliminate the position of "staff assistant" to senior LILCO executives. Catacosinos's affidavit states his belief that staff assistants impede the flow of information between the executive and others in the organization and cause the executive to lose familiarity with the areas for which he or she is responsible.

Binder was not among the five hundred laid off. However, Dr. Cordaro's elevation from Vice President of Engineering and Administration to Senior Vice President of Operations and Engineering put Binder's continued employment as an assistant to Cordaro in conflict with Catacosinos's policy against staff assistants for senior LILCO executives. Indeed, in December 1985, when Cordaro assumed his new post, Catacosinos asked John Dye, LILCO's Executive Vice President, "to make sure Dr. Cordaro did not bring any staff assistants with him." At that time, Cordaro had two staff assistants, Walter Ferrarro, age 46, and Binder, age 56. Catacosinos stresses in his affidavit that his

> directive regarding Dr. Cordaro's staff assistants was not based on the qualifications or performance, nor identity of those "staff assistants" nor their ages.... [M]y opposition to the continuation of those positions was based on my general belief that "staff assistants" are organizationally unnecessary and inefficient.

A few months after issuing this directive, Catacosinos discovered that Ferrarro and Binder were still serving as Cordaro's staff assistants. Catacosinos then told Cordaro directly that he was not permitted to have staff assistants in his new position. Cordaro again failed to act, whereupon Catacosinos spoke with him a second time, this time emphasizing that he "must take action and that he should confer with Human Resources to attempt to locate other positions for these individuals." Only after this second conversation did Cordaro comply with Catacosinos's directive and eliminate Ferrarro's and Binder's positions.

In October 1986, after learning that his position was to be eliminated, Binder met with Robert Kelleher, LILCO's Vice President of Human Resources, to discuss other employment opportunities within the company. According to Binder's affidavit, Kelleher gave Binder no reason to doubt that he would receive another position. Kelleher stated that he would look for a position and would contact Binder when something arose.

Several months passed without any word from Kelleher. Binder states that Kelleher's silence did not seem odd at the time because it was "consistent with the absence of any expression of urgency regarding the elimination of my position as Consulting Engineer, the fact that I was still performing important functions at the

Company, and past practice at LILCO." Kelleher's affidavit states that he made no effort to contact Binder because, after reviewing both existing vacancies and upcoming personnel needs, he was unable to find another position within the company suitable for someone with Binder's qualifications and experience. Specifically, the affidavit states:

As a result of this meeting with Mr. Binder, I reviewed upcoming organizational requirements to determine whether there might be something suitable for Mr. Binder. By "review" I mean I looked at personnel requisitions that had been submitted either to fill vacancies or new positions, and I thought about any information I had obtained verbally—perhaps that someone was planning to retire or resign. I was seeking positions which would have been appropriate for Mr. Binder (as well as Mr. Ferrarro). By "appropriate" I mean within the salary and grade level Mr. Binder was at and requiring many, if not all, of the technical skills he possessed.... One of my concerns in placing someone of Mr. Binder's education and experience is that I not "underemploy" the individual. By that I mean that if you place a person in a position which uses little of their knowledge or places them in a subordinate role to that which they had been filling, the individual becomes frustrated and suffers from low morale....

\* \* \* \* \* \*

Based on Mr. Binder's experience, skills and salary, it appeared to me there were no positions available within the Company at that time or in the immediate foreseeable future. By "available" I mean positions which were approved and, therefore, budgeted for and for which there was a vacancy.

Kelleher was not the only person at LILCO whom Binder contacted in an effort to secure a new position, however. In January 1987, Cordaro mentioned to Christopher Cole, manager of the company's newly formed Project Management Department, that Binder was available. After Binder approached Cole, Cole offered Binder a position in that department. This was, however, an unbudgeted position, and when it was submitted for approval to Catacosinos, he refused to authorize it. Binder asserts that Catacosinos rejected the proposed position because he wanted to force older workers, such as Binder, out of the company. Catacosinos, on the other hand, states the following:

When I investigated the situation, I came away with the opinion that Mr. Cole had sought to create a job in addition to those already authorized by me for this new organization because his boss, Dr. Cordaro, led him to believe he wanted him to. Although the tasks set forth to be performed by the person to fill this position were necessary, they were not high priority tasks and could have been performed by the authorized complement.... I could not permit a job to be added simply to keep an individual with the Company; it was imperative that the Company keep its costs at a minimum and learn to run more effectively and efficiently. For this reason, I barred the creation of an additional position in Project Management.

Binder's affidavit concedes that the particular position may not have existed at the time of Cole's offer by acknowledging that Cole continued to seek the creation of such a position after Binder's departure. However, Binder also states that there were numerous other positions opening up in the Project Management Department for which he was qualified but for which he "was not even considered" and that they were filled by persons who were younger than he.

On February 3, 1987, LILCO told Binder to accept early retirement or face termination. Catacosinos explains the company's ultimatum as follows:

[I]t was not Mr. Binder that I was objecting to. It was an organizational imperative that required me to act as I did. At no time did I say or infer [sic] to anyone that no job should be found for Mr. Binder. On the contrary, my concern was only that an available, budgeted position commensurate with Mr. Binder's experience be found. If there was no such

position, then the Company would have to make the decision to separate Mr. Binder from employment with LILCO. I never directed that a position not be found for Mr. Binder.

... The decision regarding the elimination of Mr. Binder's position was based solely on legitimate business reasons and was in no way predicated upon Mr. Binder's age.

Although Binder elected to "retire," LILCO concedes that his retirement was not voluntary.

In April 1988, Binder commenced the instant action, alleging violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. (1988), and by amended complaint, the New York Human Rights Law, N.Y. Exec. Law § 296 (McKinney 1991). Following a period of discovery, LILCO moved for summary judgment, which was granted. Binder now appeals.

## DISCUSSION

To prevail on a motion for summary judgment, the moving party must establish that there is no genuine issue of material fact to be submitted to the trier of fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir.1988). "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." Brady, 863 F.2d at 210 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) and Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

However, where the nonmoving party bears the burden of proof as to a particular issue, the moving party may satisfy his burden under Rule 56 by demonstrating an absence of evidence to support an essential element of the nonmoving party's claim. Celotex, 477 U.S. at 325, 106 S.Ct. at 2553;

Brady, 863 F.2d at 210–11. As we have observed:

[W]here the moving party has attempted to demonstrate that the nonmoving party's evidence is insufficient as a matter of law to establish his claim, the burden shifts to the nonmoving party to come forward with persuasive evidence that his claim is not "implausible." The question then becomes, is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party.

Brady, 863 F.2d at 211 (citations omitted). Viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986).

The parties' respective burdens of proof under the ADEA are the same as under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1988). See, e.g., Taggart v. Time, Inc., 924 F.2d 43, 45–46 (2d Cir.1991); Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 103 (2d Cir.1989); Russo v. Trifari, Krussman & Fishel, Inc., 837 F.2d 40, 43 (2d Cir.1988). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). An employer may not remain silent in the face of a prima facie showing but must come forward with a "clear and reasonably specific" explanation of its decision to rebut the prima facie showing and to afford the plaintiff a full and fair opportunity to show pretext. Id. at 258, 101 S.Ct. at 1096. Nevertheless, "the burden of persuasion does not shift to the employer to show that its stated legitimate reason for the employment decision was the true reason," Price

*Waterhouse v. Hopkins*, 490 U.S. 228, 245, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989) (emphasis added),[1] although the plaintiff may prove discrimination "either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly* by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (emphasis added).

■ We examine the parties' evidentiary submissions in light of these principles. We agree with LILCO that the no-staff-assistant policy applicable to senior executives was an age-neutral policy. Binder has offered no evidence that this policy was anything but a legitimate attempt to enhance efficiency by removing impediments to the flow of information to and from executives and by ensuring that executives not delegate their responsibilities. Binder has not, for example, proffered evidence that younger staff assistants were allowed to remain in their positions. We also agree with LILCO that Binder has failed to present evidence that the failure to approve the new but unbudgeted position offered to Binder by Cole was based on age. Binder's affidavit states that Cole continued to seek to have that position created after Binder was forced to take early retirement. Cole's conduct, therefore, demonstrates that the position did not exist when Cole made his offer to Binder. Moreover, in asserting that the job responsibilities of this proposed position were spread among several other positions in the Project Management Department, Binder tacitly concedes that the position was in fact never created, much less created and filled by a younger person. There is no evidence that Catacosinos's refusal to create the new position was based on anything other than the need to economize. Binder thus failed to carry his burden with regard to both the loss of his position as

assistant to Cordaro and to the offer of a position that did not exist by Cole.

■ However, Binder also asserts that numerous other positions were opening up in the Project Management Department when he was forced to retire, that he was qualified for many of them, and that they were filled by younger people. In response, LILCO proffered Kelleher's and Catacosinos's affidavits. Kelleher does not deny the availability of such positions or that they were filled by younger persons. Rather, he states that none were "suitable" or "appropriate" for Binder because none were at the salary and grade level achieved by Binder or required the technical skills he possessed. That being the case, he concludes that Binder would have been "underemployed" in any of the jobs that were open or imminently so, and that placing him in such a position would have led to his frustration and low morale. Catacosinos's affidavit echoes this view in stating that any position offered to Binder would have to be commensurate with his experience. We do not believe that these affidavits are sufficient as a matter of law to rebut Binder's prima facie case.

■ In *Taggart v. Time, Inc.*, decided after the grant of summary judgment in the instant matter, we reversed an entry of summary judgment for the defendant employer where the employer's professed reason for rejecting a job applicant was "overqualification." Taggart had applied for some thirty-two positions throughout Time's businesses, and we held that Time's rebuttal evidence that Taggart was overqualified for one of these positions might be considered pretextual by a trier of fact. *See* 924 F.2d at 48. The only relevant difference between the facts in *Taggart* and those in the instant case is that Binder made no express statement that he would accept a particular job at a lower salary or grade level. However, Binder had no occa-

---

**1.** The result in *Price Waterhouse*, a mixed-motive case, is not to the contrary. There, the Court held that, once a plaintiff had established, by direct evidence, that her gender was a significant motivating factor in her failure to make partner, the burden shifted to the employer to show that this proven discrimination was harm-

less. However, the burden of establishing what was "deemed an affirmative defense," 490 U.S. at 246, 109 S.Ct. at 1788, arose only after the plaintiff had proven that her employer acted unlawfully; it did not arise on the basis of a prima facie showing.

sion on which to express his views on the matter. Kelleher's affidavit indicates that no particular positions were discussed with Binder and that the "suitability" of a position for Binder was Kelleher's, rather than Binder's, decision. Catacosinos's affidavit again echoes Kelleher on this point. Although a trier would be free to conclude that Kelleher was acting out of a genuine desire to avoid placing Binder in a job in which he might be frustrated, exhibit low morale and perform poorly, it would also be free to conclude that this explanation was pretextual. The ADEA does not forbid employers from adopting policies against "underemploying" persons in certain positions so long as those policies are adopted in good faith and are applied even-handedly. However, such policies may also serve as a mask for age discrimination, and the issues of good faith and evenhanded application cannot be resolved on a motion for summary judgment on the present record. We therefore reverse.[2]

To avoid repetitious proceedings, we address an evidentiary ruling of the district court that has been briefed on this appeal. In an effort to show that LILCO's stated explanation was pretextual, Binder has cited LILCO's written submission to the EEOC stating that "the final decision regarding [the elimination of Binder's position] was reached in October of 1986." Binder asserts that the bulk of LILCO's submissions indicate that the decision to eliminate Binder's position was made at an earlier date, and that, therefore, the EEOC statement casts doubt on LILCO's professed explanation.

█ Although the district court noted that LILCO's submission to the EEOC seemed to strengthen rather than weaken LILCO's case, the court refused to consider the EEOC statement on the ground that Section 706(b) of Title VII, 42 U.S.C. § 2000e–5(b) (1988), bars the admissibility in court of anything "said or done" in informal proceedings before the EEOC. This was erroneous. The district court's assumption that Title VII's provision regarding the inadmissibility of statements before the EEOC applies to ADEA actions is unfounded. Although much of the case law interpreting the ADEA and Title VII is congruent, differences between the two statutory schemes exist and may not be ignored. Title VII contains an express provision barring the admissibility of statements made to the EEOC, whereas the ADEA contains no such provision. Congress enacted the ADEA in the wake of Title VII, and we believe that any omission in the text of the ADEA of a provision found in Title VII is likely to reflect a deliberate decision on Congress's part. Whether the exclusionary rule of Section 706(b) of Title VII is preferable as a matter of policy is not for us to decide. It is not so clear that the use in subsequent litigation of factual statements submitted to the EEOC is so unwise that we are tempted to find by implication a rule barring such use. Factual statements regarding past events are distinguishable from offers of compromise, and, if the principal objective of an EEOC proceeding is to ascertain what has occurred and, wherever possible, to resolve disputes without litigation, a rule that allows employers to give off-the-record accounts of relevant events will not necessarily advance that objective. Accordingly, based on both the ADEA's lack of an express analog to Section 706(b) of Title VII

---

**2.** In reversing, we do not rely upon a statistical chart produced by Binder purporting to show that LILCO favored younger workers in its 1984 lay-offs. Although Binder was not among those laid off, based on this summary, Binder's attorney represented to the district court that "the percentages of those fired increased substantially with age and adversely impacted on older employees," pointing to LILCO's termination of only 4.8% of employees in the 30–35 age group as compared with 17% in the over–60 age group. As the district court noted, however, the chart from which these figures are drawn is marked "as of 3/12/84" and thus appears to have been based on rather stale data. More significantly, it does not prove even what it was offered to prove, because it also shows that employees in the age group "to 29" accounted for more than 20% of LILCO's earlier terminations. This fact suggests that, contrary to Binder's contention, LILCO did not disproportionately favor its younger workers during previous workforce reductions. Given these infirmities, we agree with the district court's conclusion that Binder's chart fails to support his claim of discrimination against older workers.

and our belief that EEOC proceedings will not be impaired by a rule allowing the admission in subsequent litigation of factual statements made during the course of EEOC proceedings, we hold that the district court erred when it refused to consider LILCO's EEOC statement.[3]

However, like the district court, we note our skepticism as to the purported relevance of the EEOC statement. LILCO's statement that it made the "final" decision to eliminate Binder's position in October 1986 is not inconsistent with the company's contentions. Catacosinos's affidavit states that he issued his directive regarding Ferrarro and Binder in December 1985 but recounts at length the difficulties that he faced in getting Cordaro to implement the directive. It hardly undercuts Catacosinos's credibility, or that of others at LILCO, to have told the EEOC that the company's "final" decision to eliminate these positions was made in October 1986, the time at which Cordaro actually eliminated Binder's position.

We vacate and remand for further proceedings consistent with this opinion.

ALTIMARI, Circuit Judge, concurring:

Under constraint of this Court's recent decision in *Taggart v. Time Inc.*, 924 F.2d 43 (2d Cir.1991), I concur in the decision reached by the majority. I write separately to express my concern that *Taggart* will make summary judgment in many Age Discrimination in Employment Act ("ADEA") cases a rarity and will place numerous employers in an untenable predicament.

A literal reading of *Taggart* strongly suggests that whenever an employer refuses to hire or retain an "overqualified" person, who is protected under the ADEA, a resulting employment discrimination action will automatically present a triable issue of fact. While this outcome might be justified if the term "overqualified" were invariably a buzzword for "too old," in reality an employer may have legitimate reasons for

declining to employ overqualified individuals. Indeed, the Court in *Taggart* acknowledged this point when it indicated that overqualification is a permissible basis to refuse to hire or retain "a younger person." *Taggart*, 924 F.2d at 47–48 ("An employer might reasonably believe that an overqualified candidate—where that term is applied to a younger person—will continue to seek employment more in keeping with his or her background and training.").

Certainly, an employer might reasonably determine that placing an "overqualified" individual in a particular position would, as defendant-appellee LILCO contends, demoralize the individual and engender frustration, low morale and poor job performance. When such a judgment is made, under circumstances that fail to give rise to an inference of age discrimination, summary judgment should be available. To hold otherwise bestows talismanic significance on the term "overqualified" and needlessly permits ADEA plaintiffs to evade meritorious motions for summary judgment. This result is at odds with the precedent of this Circuit, *see Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988), and contrary to the spirit of Federal Rule of Civil Procedure 56(c), *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

It also seems to me that *Taggart* foists an unfair and unnecessary "heads I lose, tails you win" choice upon employers. After *Taggart*, when an employer legitimately concludes that a job applicant—who is within the ADEA's protected class—is overqualified for the position sought, what are the employer's choices? The employer can reject the applicant and risk an ADEA action that will necessarily require trial on the merits. Alternatively, the employer can extend an offer to the applicant and

---

**3.** LILCO's statement to the EEOC was a written explanation of the reasons for and timing of the challenged employment decision. It thus was a factual representation to an administrative tribunal. We express no view as to whether we would reach the same conclusion had the statement been made during settlement negotiations between the parties.

wait to see if its concerns about morale, frustration and poor job performance were accurate. I seriously doubt that Congress intended this Hobson's Choice when it enacted the ADEA.

Finally, as the majority notes, *Taggart* was decided after the district court granted summary judgment on behalf of LILCO. Thus, when Judge Mishler issued his thoughtful and well-reasoned opinion, he was unaware of *Taggart* and its implications. I therefore believe that on remand the district court should initially consider whether evidence exists that would permit a reasonable trier of fact to conclude that LILCO's stated reason for not retaining Binder was pretextual.