**SUTTON HILL ASSOCIATES,
a Partnership, Plaintiff,**

**v.**

**Michael LANDES, Albert Schwartz
and RKO Cinema 5 Theatre
Corporation, Defendants,**

**Michael R. Forman, James J. Cotter, Sutcin Holding Corporation, City Cinema Corporation and Royal Insurance Company of America, Additional Defendants on Counterclaims.**

**No. 87 Civ. 8452 (PKL).**

United States District Court,
S.D. New York.

Oct. 17, 1991.

Mayer, Brown & Platt, New York City (Daniel R. Benson, Michael M. Fay, James J. Stricker (admission pending), Steven Wolowitz, of counsel), for plaintiff and counterclaim defendants Michael R. Forman, James J. Cotter, Sutcin Holdings Corp. and City Cinemas Corp.

Graubard Mollen Horowitz Pomeranz & Shapiro, New York City (Scott E. Hershman, Scott E. Mollen, Barbara Jean Romaine, Jack Weinberg, of counsel), for defendants.

Bingham Englar Jones & Houston, New York City (James J. Taylor, of counsel), for counterclaim defendant Royal Ins. Co. of America.

## OPINION AND ORDER

LEISURE, District Judge.

This diversity action arises out of the collapse of the ceiling of the Murray Hill Cinema ("Murray Hill" or "Cinema") on July 15, 1986. The case is currently before the Court on the parties' cross-motions for summary judgment. Plaintiff Sutton Hill Associates ("SHA"), a California general partnership, seeks summary judgment in its action to recover the proceeds of an insurance settlement it negotiated with counterclaim defendant Royal Insurance Company of America ("Royal"). Defendants Michael Landes, Albert Schwartz and RKO Cinema 5 Theatre Corporation ("Tenants") move for summary judgment dismissing SHA's actions against them for recovery of damages. Finally, counterclaim defendant Royal moves for summary judgment with respect to Tenants' action against it for recovery of additional insurance payments. For the reasons that follow, summary judgment is denied as to all moving parties in full.

## I. BACKGROUND

### A. *The Ceiling Collapse and Resulting Lawsuits*

The dispute before the Court is the result of an ill-fated agreement by Tenants to operate the Murray Hill Cinema, located at 160 East 34th Street.[1] By lease dated August 16, 1985, Tenants rented the Cinema from SHA for a three year term, for an annual rental fee of $350,000 plus other additional fees covered in Sections 4.02, 4.03 and 5.01 of the lease. However, on July 15, 1986, 11 months after the lease agreement was executed, portions of the ceiling of the Cinema collapsed during a showing of the film "Psycho III." The Murray Hill was thereafter closed by the New York City Department of Buildings.

---

1. This case has been trial ready since August 23, 1990, when the Pretrial Order was adopted by the Court. Besides the briefs addressed to the various cross-motions, the Court has the benefit of referring to the undisputed facts in the Pretrial Order and to the parties' various trial memoranda.

The ceiling collapse precipitated a welter of lawsuits between the principals to the transaction and their insurer. In 1988, after the ceiling collapse but before the lease expired by its own terms, Tenants sought from the Court both a declaration of their right to continue renting the theatre and injunctive relief to prevent SHA from dispossessing them. Based on oral findings made in a proceeding on July 27, 1988, and on a written Opinion and Order dated January 30, 1989, the Court denied Tenants' claims for relief in full, awarding sole possession of the Cinema to SHA.

The other wing of the litigation concerns allocation of the cost of repairing the Cinema. In April 1987 SHA and Royal executed an insurance settlement agreement in which SHA was to receive $498,470.00 for damage to the theatre and $232,750.00 for rent loss, for a total of $731,220.00. However, pending resolution of contested claims to the insurance proceeds, the settlement fund was deposited into Court by Order dated August 23, 1988. The instant motions seek a declaration from the Court concerning entitlement to the insurance proceeds and a determination of whether the proceeds of the insurance settlement are SHA's only recourse, or whether Tenants or Royal remain liable for further damages arising out of the collapse.

While the legal support for the parties' positions is explored in greater detail below, it is useful to briefly examine the contentions before proceeding. SHA claims first that it is entitled to the settlement proceeds that were deposited into Court because its insurable interest under the policy is distinct from Tenants' interest: therefore, claims SHA, Tenants have no basis for objecting to distribution of the funds. SHA next asserts that the settlement it executed with Royal is insufficient to cover the loss it suffered. It therefore seeks an additional recovery from Tenants, claiming that the ceiling collapse was caused by Tenants' neglect and negligence and that, under the lease, Tenants are liable for the cost of repairs.

Tenants respond by claiming that, by the terms of the lease and the insurance policy obtained in conformity therewith, all risk of loss with respect to damage to the Cinema was transferred to Royal, the insurer. They assert that SHA must look to Royal to recover for damage to the Murray Hill and insist that SHA's dissatisfaction with the allegedly inadequate settlement does not serve as a proper basis for a suit directly against Tenants. Tenants also dispute SHA's claim that SHA's interest in the policy is separate and distinct from Tenants' interest: Tenants claim an interest in the settlement proceeds to the extent that SHA seeks to recover directly from them. Finally, Tenants contest SHA's claim that the ceiling collapsed because of Tenants' neglect; rather, they assert that the ceiling fell because of a latent defect existing when Tenants took possession of the premises.

Royal's position in the instant litigation follows from Tenants' position. According to Royal, Tenants are correct in asserting that SHA can only look to the insurance policy with Royal for compensation for its casualty loss. Royal then contends that, because it has entered into a full settlement with SHA, Tenants have no remaining claims against it.

### B. *The Lease and the Insurance Policy*

In August 1985 SHA and Tenants executed a lease; Tenants subsequently purchased insurance to satisfy the obligations they assumed thereunder. In considering the obligations of the parties to the lease, the Court notes that the contract was between business entities, and represented an "agreed upon ... allocation of their respective responsibilities, risks and insurance obligations pertaining to the possibility of property damage.... [T]he parties should ... abide by their agreed-upon allocation of the risks and responsibilities, once the meaning of their agreement has been determined." *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 76 N.Y.2d 228, 232, 557 N.Y.S.2d 290, 292, 556 N.E.2d 1097 (1990). It is therefore incumbent upon the Court to carefully scrutinize the lease to ascertain the true meaning of the parties' agreement.

The repair obligations of the Tenants are set forth in Section 7.01 of the lease:

> Tenant shall ... put, keep and maintain in good working order and operating condition and repair the Demised premises, both interior and exterior and all fixtures, equipment and personal property of Landlord located therein; including, but without limitation, the roof, the marquee, all fixtures, building systems and equipment ... and all plate glass, furnishings, doors, windows, molding trim, window frames, closure devices, door and window hardware and except as herein otherwise provided, plumbing, heating, ventilation, air conditioning and mechanical systems and equipment therein.... Tenant's obligations hereunder shall not be construed to impose upon Tenant the obligation to repair the roofs or any structural elements or any of the building systems and equipment if the repair thereof is no longer feasible, or would cost an amount in excess of $10,000, unless the condition requiring such replacement has been caused by or is the result of Tenant's misuse or neglect.

SHA's repair obligations are found in Section 8.01:

> Landlord shall ... make all structural repairs it deems necessary and appropriate to the demised Premises inside and outside, and shall upon notice from Tenant as to the need therefor, make such repairs as may be required to preserve the structural integrity of the walls, foundation, marquee structure, beams and supports, unless such repairs are required as a result of Tenant's misuse or neglect.

■ A careful examination of the items listed in Section 7.01 reveals that Tenants were responsible for repair and upkeep of items requiring ongoing, regular care, whereas SHA was responsible for structural repairs under Section 8.01. It appears to the Court that a ceiling is much closer in nature to walls, beams and supports, which are covered in Section 8.01, than to the items listed in Section 7.01, which need ongoing maintenance. Therefore, given the allocation of responsibilities in the lease, the Court finds that SHA was responsible for upkeep and repair of the ceiling under Section 8.01. In addition, both Sections 7.01 and 8.01 contain an exception to SHA's responsibility for structural repairs if necessitated by Tenants' misuse or neglect. Therefore, SHA's responsibility for repair of the ceiling was conditioned by the following caveat: if the damage were caused by Tenants' misuse or neglect, Tenants were responsible for repair.

The lease also addresses the responsibility of the parties with respect to insurance coverage. Under Section 12.01(A), Tenant was obligated, at its sole cost and expense to:

> Maintain insurance against any loss or damage to the Demised Premises and the buildings in which the Demised Premises are contained by fire, vandalism, malicious mischief and such other risks as may be included under the broadest form of "extended coverage endorsement" from time to time available, in amounts sufficient to prevent Landlord or Tenant from becoming a co-insurer within the terms of the applicable policies.

Section 12.01(C) required Tenants to:

> Maintain property damage insurance coverage upon all equipment and fixtures and personal property located on the Demised Premises against loss or damage by fire, vandalism and other risks of a similar or dissimilar nature as are or shall be customarily covered under the broadest form of "extended coverage endorsement" from time to time available in an amount which shall be sufficient to prevent Landlord or Tenant from becoming a co-insurer of any loss.

Further, Section 12.01(D) required purchase of insurance to cover 12 months of lost rental fees. Section 12.03 provided that if Tenants failed to purchase insurance, SHA had the option to obtain coverage and make payment therefor, charging Tenants for the cost of the policy. Section 12.05 of the lease provided further specifics concerning insurance:

> All policies of insurance to be obtained by Landlord and Tenant shall, to the extent that the same is obtainable with-

out additional premium therefor, provide that any loss shall be payable notwithstanding any act or negligence of Landlord or Tenant which might otherwise result in a forfeiture of such insurance, and also provide for waivers of subrogation against Landlord and Tenant ... The policies ... shall name Landlord and Tenant as the insureds, as their respective interests may appear.

The lease also addresses the process to be followed in the event of damage to the theatre. Section 20.02 gave SHA the option to demolish the theatre and terminate the lease in the event of extensive damage to the Cinema. If SHA did not demolish the Murray Hill, then, under Section 20.03:

> [I]n the event the ... Murray Hill is partially damaged or rendered unusable by fire or other casualty, Landlord shall utilize the casualty insurance proceeds to the extent to which the same are adequate for the requisite repairs and restoration.

Tenants took out an insurance policy with Royal to satisfy their lease obligations. Although the specific provisions of the coverage need not be recounted, one provision of the policy is relevant here. As required by the lease, there is no exclusion barring recovery for damage suffered as a result of the negligence of either SHA or Tenants. However, the policy does not insure against loss or damage caused by latent defect. *See* Exhibits to Affidavit of Scott E. Mollen, Esq., in Support of Cross–Motion for Partial Summary Judgment ("Tenants' Exhibits"), Ex. M, at 9.

■ Having determined how responsibility for repair was allocated under the lease, and having discussed the parties' agreement concerning insurance, the Court next considers how these provisions interact, with the goal of ascertaining to whose benefit an insurance recovery should inure. Given that damage caused by latent defect was excluded from the insurance policy,

any recovery from Royal arising out of the collapse of the ceiling at the Murray Hill must, as a matter of law, have been related to some act or omission of either SHA or Tenants. If the collapse resulted from misuse or neglect of Tenants, it is Tenants who are responsible for repairs under the lease: in this case the proceeds of the insurance policy should inure to the benefit of Tenants, and SHA would have no right to recover from Royal. Conversely, SHA is responsible under the lease for structural repairs in those cases where damage was not caused by Tenants' misuse or neglect. Therefore, SHA is only entitled to recover under the insurance policy to cover the cost of repairs if the collapse was not caused by the misuse or neglect of Tenants. Finally, to the extent that both SHA and Tenants shared responsibility for the collapse of the ceiling, there is a shared interest in recovering from Royal.[2]

## II. DISCUSSION

### A. *Standard for Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Summary judgment is appropriate if, 'after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.'" *United States v. All Right, Title & Interest in Real Property, etc.*, 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). Summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an ele-

---

**2.** Despite this allocation of responsibility for repairs, the Court notes that Section 20.03 required SHA to use insurance proceeds to repair the theatre. The lease is therefore somewhat ambiguous: Section 8.01 allocates responsibility for repair based on the presence or absence of neglect or misuse by Tenants, whereas Section 20.03 requires SHA to use insurance proceeds to effect repairs without regard to Tenants' neglect or misuse.

ment essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The substantive law governing the case identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993 (2d Cir.1991). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552–53. "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra*, 477 U.S. at 325, 106 S.Ct. at 2553–54; *see Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991).

Once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson, supra*, 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & H. Ry. v. Consol-*

*idated Rail Co.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson, supra*, 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)), cert. denied, —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' or defeat the motion through 'mere speculation or conjecture.' " *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting *Borthwick v. First Georgetown Sec., Inc.*, 892 F.2d 178, 181 (2d Cir.1989) and *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

B. *Recovery of the Proceeds of the Insurance Settlement*

The Court first turns to SHA's summary judgment motion, which seeks a declaration that SHA is entitled to receive the proceeds of the insurance settlement it negotiated with Royal in April 1987. SHA argues that it is entitled to receive these funds because its interest in the insurance policy is separate from the interest of Tenants in the policy. SHA asserts that it can settle its individual claim with its insurer without objection by Tenants, who have no claim on SHA's separate insurable interest.[3]

Tenants seek to prevent distribution of the insurance proceeds on a number of bases. First, they claim an interest in the insurance proceeds because SHA is seeking to recover from them, in a separate cause of action that this Court addresses below, for damages that Tenants feel should be covered by the insurance policy. Tenants therefore seek to link together two of the motions currently before the Court: "If Tenants' motion for partial summary judgment is denied, SHA's motion for summary judgment also must be denied." Defen-

**3.** SHA relies on *Bethlehem Steel Corp. v. Niagara Mohawk Power Corp.*, 93 A.D.2d 983, 461 N.Y.S.2d 632 (4th Dept.1983), to support its position that a non-party has no standing to challenge a settlement. However, that case rejected an attempt to reopen the settlement of a lawsuit because the settlement had no res judicata impact on the non-party. *Bethlehem Steel* is therefore inapposite to the Court's reasoning in the instant case.

dant's Memorandum of Law in Support of Their Cross–Motion for Partial Summary Judgment Dismissing Plaintiff's Counter-claims and in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendant's Response"), at 50. Second, Tenants raise four factual issues that they claim preclude summary judgment: the true cause of the ceiling collapse; whether SHA excluded Tenants from their negotiations with Royal; whether SHA purposefully delayed repairs; and whether the cost of repairs was increased because SHA multiplexed the theatre.

The Court begins by rejecting Tenants' claim that SHA can only recover the insurance settlement proceeds if the Court bars SHA from suing Tenants directly. Tenants have not provided, and the Court has been unable to locate, any support for the argument that the fate of SHA's motion is inextricably bound to the result in Tenants' cross-motion. It is obvious that the factual issues involved in the motions overlap: SHA's right to recover directly from Tenants depends on whether SHA has collected from its insurer and whether this recovery preempts a suit against Tenants. However, without legal support, this Court sees no reason to refuse the relief sought by SHA because it may reject the relief Tenants seek.

■ The Court next turns to the substantive law governing which facts are material to the instant motion. New York law provides that "absent contrary unambiguous provisions, the [insurance] policy must be construed as covering the interests of each [insured] separately, a construction consistent with the reasonable expectations of a policyholder." *Krupp v. Aetna Life & Casualty Co.*, 103 A.D.2d 252, 479 N.Y.S.2d 992, 998 (2d Dept.1984). Although the insured parties in *Krupp* were married, the result is the same when the insured are landlord and tenant: a "tenant and owner ... have different insurable interests in the subject premises." *Yaccarino v. St. Paul Fire & Marine Ins. Co.*, 150 A.D.2d 771, 542 N.Y.S.2d 660, 661 (2d Dept. 1989). Separate treatment of the interests of the insured is clearest when the policy states that the interests of the insured are distinct. *See Wenig v. Glens Falls Indemnity Co.*, 294 N.Y. 195, 61 N.E.2d 442, 445 (1945) ("under the terms of the policy, reasonably construed, the obligation of the company to each assured is separable"); *Broquedis v. Employers Mut. Liab. Ins. Co.*, 45 A.D.2d 591, 360 N.Y.S.2d 735, 738 (4th Dept.1974). However, in the absence of explicit contractual language, New York law imposes a presumption of separateness: "Absent specific language to the contrary, the policy will be construed as covering the interest of each [insured] separately." *Graziane v. National Surety Corp.*, 120 A.D.2d 773, 501 N.Y.S.2d 232, 234 (3d Dept.1986).[4]

This examination of New York law demonstrates that the material fact at issue here is whether Tenants have an interest in the settlement proceeds. If Tenants have an interest, they can object to distribution of the funds; however, if they have no interest in the insurance settlement, they have no basis for objecting to its distribution. It is clear, as SHA argues and Tenants concede,[5] that the insurable interests of a landlord and tenant are separate.

---

**4.** The Court notes that the inquiry into the respective interests of parties in an insurance policy is often made in contexts far different from the case at bar, making the cases applicable only by analogy. In *Yaccarino, supra,* 542 N.Y.S.2d at 660, the Court focused on the distinct interests of landlord and tenant to show that one's proof of loss statement did not bind the other. In *Broquedis, supra,* 360 N.Y.S.2d at 738, the Court found that the parties' insurable interests were separate to support the holding that the insurance company could not cancel a policy based on unilateral notice received from only one of the insured.

**5.** *See* Defendant Almi's Pre–Trial Memorandum of Law ("Defendant's Pretrial Memo"), at 23 n. * ("[N]othing in the policy gave rise to an interpretation that the rights of the insureds are joint. Instead, the policy and the reasonable expectations of the insureds can only be interpreted as giving rise to separate obligations to each insured."); Defendant's Response, at 42 ("SHA and Tenants would look to the insurance to cover their *respective* insurable interests in the event of a loss") (emphasis added).

However, to determine which party has a right to the insurance proceeds, the Court must do more than intone that the interests of SHA and Tenants in the policy are different: it must examine the content of the parties' interests. *See, e.g., S.S.D.W.,* supra, 557 N.Y.S.2d at 290, 556 N.E.2d at 1097 (contractor has insurable interest in tools, labor and materials; owner has interest in building itself); *Graziane, supra,* 501 N.Y.S.2d at 232 (spouses each hold one-half interest in property under divorce decree).

This Court's inquiry into the interests of SHA and Tenants in the insurance policy is governed by the lease and the allocation of responsibilities therein. *See S.S.D.W.,* supra, 557 N.Y.S.2d at 292, 556 N.E.2d at 1099. The Court found above that, under Section 8.01, SHA is responsible for repairs if the damage was not occasioned by Tenants' neglect or misuse: therefore, SHA's interest in the insurance policy lies in recovering for the cost of repairs if the Tenants were not at fault. Since Tenants are responsible for repair if their misuse or neglect necessitated the repairs, they have an interest in the insurance recovery if they were the cause of the damages. If both parties caused the ceiling collapse, they both have an interest in the insurance proceeds.

This Court will only grant SHA's summary judgment motion and allow it to withdraw the settlement proceeds from the Court if it can show that it has an interest in and a right to recover under the insurance policy, because it was responsible for repairing the Cinema. However, this Court cannot determine whether SHA, Tenants or both parties were responsible for repairs and entitled to recover from the insurer without determining whether the collapse was caused by the fault of one of the parties, an inquiry that is factual in nature.

Therefore, because there exist genuine issues of material fact, SHA's summary judgment is denied.[6]

## C. *SHA's Suit Directly Against Tenants*

■ The Court turns next to Tenants' summary judgment motion seeking dismissal of SHA's action against them for damages. SHA has asserted causes of action to recover for the purported breach of Tenants' obligation to maintain the roof of the Murray Hill, for damages relating to the ceiling collapse and for rent allegedly owed by Tenants. Tenants respond by asserting that the lease required Tenants to purchase insurance that fully covered both Tenant and SHA for property damage and rental loss, and also required inclusion in the insurance policy of a waiver of subrogation clause. Therefore, claim Tenants, when SHA settled with Royal, it sacrificed any right it had to seek a recovery from Tenants for the same losses covered by insurance. Tenants conclude that if the Court finds for SHA on its motion to distribute the proceeds of the insurance settlement, it must then dismiss SHA's action seeking recovery directly from Tenants. Given the phrasing in Defendant's Response, it is possible that Tenants are requesting summary judgment only if the Court grants SHA's summary judgment motion. If this were the proper interpretation of Tenants' motion, the Court would have to look no further to deny the relief Tenants seek, since the Court has refused to allow the insurance settlement to be withdrawn from the Court. However, even addressing the merits of Tenants' motion, summary judgment must be denied.

The Court begins by examining the substantive law governing attempts to recover from a tortfeasor after an insurance settle-

---

6. The presence of ambiguity in the lease concerning responsibility for repairs is another basis for denying summary judgment. *See Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990) (denying summary judgment based on ambiguity of contractual language); *cf. Werbungs und Commerz Union Austalt v. Collectors' Guild, Ltd.,* 930 F.2d 1021,

1025–26 (2d Cir.1991) (under New York law "determination of whether contract language is ambiguous is a question of law"). Section 8.01 provides that Tenants are responsible for structural repairs necessitated by their misuse or neglect, whereas Section 20.03 imposes on SHA the duty to repair in the event of fire or other casualty without regard for responsibility.

ment has been reached.[7] The most recent case decided by the New York Court of Appeals in this area is *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 76 N.Y.2d 228, 232, 557 N.Y.S.2d 290, 292, 556 N.E.2d 1097, 1099 (1990), which involved corrective waterproofing work by a contractor at the Carnegie Towers in Manhattan. A fire broke out which caused damage outside of the work zone, and the insurer compensated the owner for its full loss. The insurer then sought to recover the cost of the damage from the contractor. The Court of Appeals found, based on a waiver of subrogation clause in the waterproofing contract, that the insurer, as subrogee of the owner, had no right to sue the contractor for damage caused by the contractor's negligence within the area covered by the insurance policy. However, the Court found that the insurer did have a right to recover, as the owner's subrogee, for damage caused to areas outside of the work zones that were insured.

Tenants cite *S.S.D.W.* in support of the proposition that once the parties to a contract shift the risk of loss caused by negligence to an insurer, they cannot sue each other, and the Court agrees that the Court of Appeals so held on the facts of that case. However, *S.S.D.W.* provides little support for Tenants' position in the instant lawsuit. In *S.S.D.W.* the waiver of subrogation clause in the contract provided that "'the Owner and Contractor waive all rights *against each other.*'" 557 N.Y.S.2d at 291, 556 N.E.2d at 1098 (emphasis added). The same is also true in the other cases that Tenants cite. *See Board of Education v. Valden Assoc., Inc.*, 46 N.Y.2d 653, 416 N.Y.S.2d 202, 202–03, 389 N.E.2d 798, 798–99 (1979) ("Owner, Contractor, and all subcontractors waive all rights,

each against the others'"); *Trump–Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp.*, 106 A.D.2d 242, 485 N.Y.S.2d 65, 67 (1st Dept.) ("'The Owner and Contractor waive all rights against ... each other'"), *aff'd*, 66 N.Y.2d 779, 497 N.Y.S.2d 369, 488 N.E.2d 115 (1985). In contrast, the waiver of subrogation clause in the lease in the instant case required "waivers of subrogation against Landlord and Tenant" by the insurer. *See* Tenants' Exhibits, Ex.L., at 21. If SHA and Tenants had been relying on the waiver of subrogation clause to eliminate liability as between them, they had a myriad of examples of explicit language on which to draw to reach that result.

Although the Court rejects Tenants' claim that the waiver of subrogation clause bars suits between SHA and Tenants, the Court does find that the cases generally allow a potentially liable party to shift the risk of loss for which it is responsible to an insurer, and that this assignment of the burden of loss exempts the alleged wrongdoer from liability. *See Great Lakes Transit Corp. v. Interstate S.S. Co.*, 301 U.S. 646, 57 S.Ct. 915, 81 L.Ed. 1318 (1937) (insurer cannot sue tortfeasor that purchased insurance); *Platt v. Richmond, Y.R. & C.R. Co.*, 108 N.Y. 358, 15 N.E. 393 (1888) (insurer cannot recover from insured after satisfying claims of injured party); *Meadvin v. Buckley–Southland Oil Co.*, 84 A.D.2d 907, 446 N.Y.S.2d 669, 671 (4th Dept.1981), *rev'd and reinstated for reasons cited in dissent*, 59 N.Y.2d 822, 464 N.Y.S.2d 744, 451 N.E.2d 491 (1983) (finding exception to collateral source rule allowing tortfeasor to benefit from insurance payments to aggrieved party when tortfeasor bought insurance to cover risk of loss).[8]

---

7. Most of the cases the Court relies on involve attempts by the insurer to recover from the tortfeasor, who purchased the insurance policy, after the insurer has satisfied claims asserted by the injured party. Because the insurer sues in the name of and as subrogee of the injured party, *see Phoenix Ins. Co. v. Erie and W. Transp. Co.*, 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873 (1886), the distinction between these cases and the case at bar is not dispositive, and the Court draws on them by analogy.

8. The cited cases indicate that when a potentially liable party purchases insurance with the goal of shifting the risk of loss to an insurer, it is for the aggrieved party to protect its own interests by negotiating an acceptable settlement with the insurer. It would appear to be in vain for an aggrieved party to negotiate a premature insurance settlement and then sue the party that purchased insurance for an additional recovery.

Despite the dearth of New York cases addressing factual scenarios exactly parallel to the case at bar, there is one recent Michigan case, *Milbrand Co. v. Lumbermens Mut. Ins. Co.*, 175 Mich.App. 392, 438 N.W.2d 285 (1989), that is very similar to the instant case. In *Milbrand*, as here, the lease required tenants to procure insurance, and allowed the landlord to purchase coverage and charge the tenant for its cost if the tenant failed to insure. The lease also made tenants responsible for upkeep and for keeping the premises in good repair, whereas the landlord was responsible for returning the premises to tenantable condition if destroyed by casualty. The posture of the case was also parallel to the instant action: the landlord recovered from the insurer and then sought an additional recovery from the tenant. *Milbrand* held that while the tenant was responsible for paying for insurance, its purchase of the policy shifted the risk of loss to the insurer. Absent an explicit lease provision making tenant liable for its negligence, the court found that the landlord was not entitled to bring an independent action for negligence against the tenant.

■ SHA attempts to distinguish *Milbrand* by claiming that in this case Tenants expressly assumed liability for negligence. However, SHA's assertion is little more than a word play. Sections 7.01 and 8.01 of the lease exempt SHA from responsibility for repairs in the event of Tenants' "misuse or neglect," whereas Section 12.05 expressly calls for purchase of a policy allowing recovery without respect to negligence. If the parties intended to impose unconditional liability for negligence on Tenants, they would have used the precise term, "negligence," in Sections 7.01 and 8.01. Just as the Court was loathe to rewrite the waiver of subrogation clause, it refuses to insert a provision imposing liability for negligence where the lease only refers to "neglect." [9]

■ Given the terms of the lease executed between SHA and Tenants, it is possible that the parties intended that casualty losses would be fully insured, without respect to the parties' negligence, and that they would only look to the insurer for recovery. However, given the absence of an explicit waiver of subrogation clause as between the parties, coupled with the failure to expressly make Tenants liable for negligence, the Court cannot find that there exist no issues of material fact and that it can determine the intent of the parties to the lease as a matter of law. The Court also notes that the parties dispute the meaning of the clause in the lease requiring maintenance of insurance to prevent Tenants from becoming a co-insurer. Tenants claim that the goal of this provision was to require suits only against the insurer, whereas SHA claims it is a standard clause requiring insurance covering at least 80% of the property value. Yet another disputed issue of material fact is whether the parties intended to fully shift the risk of rental loss to the insurer. The lease was for a three year term, but Section 12.01(D) only required that insurance be obtained for 12 months of lost rental payments.

Most important, the Court has been unable to determine as a matter of law which party was responsible for repairs, giving it an insurable interest and a right to recover under the policy. In fact, this factual dispute precluded release of the insurance settlement proceeds. As a result, SHA has not yet received any recovery under the insurance policy that would serve to bar its actions against Tenants. Because there exists no factual or legal basis to bar SHA's suit against Tenants at this time, Tenants' motion for summary judgment is denied.

### D. *Royal's Summary Judgment Motion*

■ The Court next turns briefly to counterclaim defendant Royal's motion for

---

**9.** The Court also rejects SHA's claim that Tenants' purchase of insurance to cover liability for negligence violates N.Y.G.O.L. § 5–323, which bars covenants exempting parties for liability for negligence. It is beyond peradventure that parties to a lease can shift the burden of loss for

negligence to an insurer. *See Hogeland v. Sibley, Lindsay & Curr Co.*, 42 N.Y.2d 153, 397 N.Y.S.2d 602, 607, 366 N.E.2d 263, 267–68 (1977). Any suggestion by SHA that this contract violated public policy is specious at best.

summary judgment. Royal seeks summary judgment on Tenants' claims against it, claiming that it has fulfilled its duties and obligations under the insurance contract. Given the Court's holdings in the previous two motions, denial of Royal's motion does not require extensive discussion. This Court has been unable to determine on the papers before it what insurable interest the settlement was meant to satisfy. It is therefore impossible to find as a matter of law that Royal has satisfied its obligation under the insurance contract. Further, all of the parties to the litigation except for Royal complain that the negotiated insurance settlement was inadequate. SHA asserts that the settlement was reached prematurely and does not cover the costs of repairs, while Tenants claim that, to the extent the settlement was deficient, liability lies with Royal. There are clearly issues of material fact relating to the adequacy of the insurance recovery, and Royal's motion for summary judgment is therefore denied.

## CONCLUSION

For the foregoing reasons, the summary judgment motions of plaintiff SHA, defendant Tenants and counterclaim defendant Royal are denied. In concluding, the Court presents closing comments on the current status of this litigation. Consideration of the parties' arguments and the applicable law has made it obvious that the lengthy course of this litigation could have been avoided by reaching a comprehensive insurance settlement that fully protected the interests of all involved. The Court believes that the relative absence of controlling precedent demonstrates that parties to this type of conflict routinely engage in multilateral negotiations that yield a comprehensive, global settlement. Indeed, the Second Circuit has questioned from time to time "whether a more meaningful effort at settlement ... might not have been made in [a] case." *See, e.g., Bell v. A–Leet Leasing Corp.*, 863 F.2d 257, 259 (2d Cir.1988) (per curiam). The *Bell* Court recognized "that, in the words of the hallowed jurisprudential maxim, 'it takes two (in this case more) to tango,' and one obdurate party or counsel can thus frustrate an otherwise

amicable settlement." *Id.* The Court urges the parties to continue their dialogue with the goal of resolving this matter. *See* Fed.R.Civ.P. 16(c)(7). If such a resolution cannot be reached, the parties are hereby ordered to attend a final pretrial conference on Monday, December 2, 1991, at 4:30 PM in Courtroom 36 of the United States Courthouse, New York, New York to finalize matters and set a date for trial.

SO ORDERED.