**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**Stephenson Equity Company, Plaintiff–Intervenor,**

v.

**CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.**

**No. 99 Civ. 11395(RWS).**

United States District Court, S.D. New York.

June 27, 2001.

Securities and Exchange Commission
(Thomas M. Melton, of counsel), Salt Lake
City, UT, for Plaintiff.

Securities and Exchange Commission (Robert Blackburn, of counsel), New York City, for Local Counsel.

Proskauer Rose (Richard Marmaro, of counsel), Los Angeles, CA, for Defendant R. Blech.

Milbank, Tweed, Hadley & McCloy (Andrew E. Tomback, of counsel), New York City, for Defendant T. Rittweger.

Getty, Keyser & Mayo (Richard A. Getty, of counsel), Lexington, KY, for Defendant D. Brandon.

Pattison & Flannery (Thomas R. Pattison, of counsel), New York City, for Third–Party Defendants, Certain Underwriters at Lloyd's, London, London Market Companies and Gulf Insurance Company.

Morrison & Foerster (Carl H. Loewenson, of counsel), New York City, for Receiver and Fiscal Agent.

Dickstein Shapiro Morin & Oshinsky (Randy Paar, of counsel), New York City, for Receiver.

## OPINION

SWEET, District Judge.

Carl H. Loewenson, Jr., Esq., the court appointed receiver in the above-captioned action (the "Receiver") has moved under Rule 56, F.R. Civ. P., to dismiss certain of the affirmative defenses asserted by the Insurers in the answer. This third party action was initiated by the Receiver on February 23, 2000 against third-party defendants, Certain Underwriters at Lloyd's ("Lloyd's"); London Market Companies; and Gulf Insurance Company ("Gulf") (collectively the "Insurers"). The Insurers have cross-moved for summary judgment on the affirmative defenses, and other grounds, as described herein. By separate motion of July 26, 2000, which was deferred for consideration in connection with the instant motions, the Receiver sought a declaratory judgment that he is not required to make a second premium payment on two of the policies at issue. The Insurers have cross-moved to dismiss all claims under either policy since the payment was not timely made.

On the findings and conclusions set forth below, the Receiver's motion is granted in part and the Insurers' motion is denied.

## Prior Proceedings

Certain of the proceedings in this action which preceded the filing of the instant motions are set forth in the prior opinions of this Court, familiarity with which is presumed. See SEC v. Credit Bancorp, Ltd., 194 F.R.D. 457 (S.D.N.Y.2000).

On November 17, 1999, the primary action was initiated by the plaintiff, Securities and Exchange Commission (the "SEC") to freeze the assets of Credit Bancorp, Ltd. and its related entities (collectively, "CBL") upon the allegations that Richard Jonathan Blech ("Blech") and others had engaged in a complex securities fraud. The fraud affected over 200 customers with interests exceeding $200 million. An equity receivership was established on January 21, 2000. The Receiver marshalled the assets and is in the process of effecting a plan of partial distribution (which is in essence a pro rata return of customer-deposited property of the CBL customers, either in the form of deposited property, i.e. securities, or in the form of cash or replacement securities) pursuant to the opinions of November 29, 2000, SEC v. Credit Bancorp Ltd., 2000 WL 1752979 (S.D.N.Y. January 19, 2001), SEC v. Credit Bancorp Ltd., 129 F.Supp.2d 259 (S.D.N.Y.), and orders of January 19, 2001 and May 16, 2001.

On February 23, 2000, the Receiver filed his third-party complaint against the Insurers. On March 13, 2000, the Receiver filed his first amended complaint. The

Insurers filed their answer on April 3, 2000 and an amended answer on June 9, 2000. The Insurers' answer includes a number of affirmative defenses that are the subject of the Receiver's motion for summary judgment. The Insurers seek summary judgment by way of cross-motion on those and other grounds. The instant motions were heard and marked fully submitted on April 4, 2001.

*Facts* [1]

## A. *The Policies*

In the London Insurance market, a lead underwriter sets the terms of the policy and premiums, and is responsible for the administration of the policies, including the addition of endorsements or modifications to the policy and claims handling. The rest of the insurers who subscribe to a policy besides the lead, whether as part of the line slip or independently, are referred to as the following market. Members of the following market tend to rely on the underwriting, administration and claims handling of the leader. Marsh, Inc. ("Marsh") is the broking division of Marsh & McLennan Companies. Marsh's London affiliate is a Lloyd's broker licensed by Lloyd's to place insurance in the London insurance market. All of CBL's policies that are relevant to this action were brokered by Marsh.

The policies at issue in this coverage action as of November of 1999 are described below.

### 1. *The Primary Policy*

Lloyd's and Gulf sold CBL a primary policy bearing policy number 509/QA472597 (the "Primary Policy") for the period November 1, 1997 through April 1, 2001. The Primary Policy is described as a "blended" policy, and combines various standard forms used in the London insurance market. It provides an aggregate of $10 million in insurance and is divided into three sections. Payment of a single premium on a multi-year Primary Policy is the common practice at Lloyd's.

Section 1(A) of the Primary Policy provides "Comprehensive Crime" coverage under a Bankers Blanket Bond. The fidelity portion of Section 1(A) provides:

UNDERWRITERS hereby undertake and agree, subject to the following terms, exclusions, limitations and conditions, to make good to the Assured ... such direct financial loss sustained by the Assured subsequent to the Retroactive Date [November 1, 1997] and discovered by the Assured during the period of the Policy and subject always to the Policy Limits as stated in the Schedule.

\* \* \* \* \* \*

*INSURING CLAUSE I FIDELITY*

... [I]t is agreed that with regard to trading or other dealings in securities, commodities, futures, options, currencies foreign exchange and the like, and loans, transactions in the nature of a loan or other extensions of credit, this Policy covers only loss resulting solely and directly from the dishonest or fraudulent acts by Employees of the Assured committed with the intent to make and which result in improper financial gain for themselves other than salary, fees, commissions, promotions or other similar emoluments.

"Employees" are defined as, "[t]he Assured's officers, clerks, servants and other

---

[1]. The Receiver has moved by separate motion to strike paragraphs of, and exhibits to, the affidavit of the Insurers' counsel, Thomas R. Pattison, on various evidenciary grounds. That motion has been considered in the determination of the material facts at issue for purposes of this motion and is not independently decided.

employees while employed by the Assured and guest students pursuing studies or duties at the Assured's premises."

Upon discovery of a loss during the policy period, the Primary Policy requires notice of the loss be provided to the Insurers:

As a condition precedent to their right to be indemnified under this Policy, the Assured shall ... within 30 days after discovery by the Assured of any loss hereunder, give written notice thereof to Underwriters.

Thus, under Section 1(A), coverage is provided for losses sustained after the retroactive date of November 1, 1997 and discovered during the policy period, provided that notice is given within thirty days of the discovery.

Section 2 of the Primary Policy provides insurance for losses arising from professional malpractice claims ("E & O"):

Underwriters shall reimburse the Assureds for Loss resulting from any Claim first made during the Policy Period for a Wrongful Act in connection with the performance of Professional Services.

The term "Wrongful Acts" is defined in the E & O Section as: "any actual or alleged error, omission, or negligent act in rendering or failing to render professional services." Exclusion E provides:

Underwriters shall not be liable for loss ...

\* \* \* \* \* \*

E. brought about or contributed to in fact by any dishonest, fraudulent or criminal act or omission by any of the Assureds, ... provided, however, no Wrongful Act shall be imputed due to any other person for the purpose of determining the applicability of Exclusion E.

Section 3 of the Primary Policy provides Directors and Officers and Company Reimbursement coverage ("D & O"). Insuring Clauses A and B provide:

A. Underwriters shall pay on behalf of the Directors and Officers Loss resulting directly from any Claim first made during the policy Period for a Wrongful Act.

B. Underwriters shall pay on behalf of the Company any Loss which the Company pays as indemnification to any of the Directors and Officers resulting from any claim first made during the Policy Period for a Wrongful Act.

"Wrongful Act" is defined as "any actual or alleged error, omission, misstatement, misleading statement, neglect, breach of duty or negligent act by any of the directors or officers, while acting solely in their capacity as a director or officer of the Company."

Exclusion G bars coverage for claims:

brought about by or contributed to in fact by any dishonest, fraudulent or criminal act or omission, or any personal profit or advantage gained by any of the Directors and Officers to which they are not legally entitled.

\* \* \* \* \* \*

No Wrongful Act shall be imputed to any other person for the purpose of determining the applicability of Exclusion G.

The Primary Policy was placed in the London insurance market pursuant to a "line slip." A line slip is an application made by an insurance broker to insurance underwriters. The broker was Marsh and the lead underwriter for various Lloyd's syndicates was D.P. Mann. Lance Dalzell–Piper was the individual at D.P. Mann who was the line-slip leader and acted as the lead underwriter. In this case, the line slip was a contract between various

Lloyd's syndicates and Marsh, pursuant to which Marsh agreed to bring the subscribing syndicates a certain volume of a particular type of business and to administer claims under those policies on the syndicates' behalf. The Primary and First Excess Crime Policies were subscribed to by the Lloyd's syndicates on the Marsh line slip and Gulf Insurance Company of the United States.

### 2. *The First Excess Crime Policy*

The First Excess Crime Policy, 509/QA474097, also sold to CBL by Lloyd's and Gulf, provides $40 million in coverage excess of Section 1 of the Primary Policy (the "First Excess Crime Policy") and covers the period from November 1, 1997 to April 1, 2001. It is a "follow form" policy which incorporates the terms and conditions of Section 1 of the Primary Policy and provides exactly the same coverage as the primary comprehensive crime coverage. Like the Primary Policy, this policy contains a clause which renders the policy void if a "false or fraudulent" claim is filed. The Gulf Insurance Company policy is subject to the same terms and conditions and follows form as to the Lloyd's Policy.

The underwriting of the First Excess Crime Policy was accomplished in conjunction with the underwriting of the Primary Policy and Lance Dalzell–Piper was the individual underwriter at D.P. Mann who acted as the lead underwriter. The syndicates on the Marsh line slip that subscribed to the Primary Policy also bound themselves, along with Gulf (US), to the First Excess Crime Policy.

### 3. *The Second Excess Crime Policy*

The Second Excess Comprehensive Crime Policy, 509/QA539299, provides $150 million in insurance excess of the $40 million First Excess Crime, which in turn is excess of Section 1 of the Primary Policy (the "Second Excess Crime Policy") and covers the period from April 22, 1999 to April 1, 2001. It is also a "follow form" policy, incorporating the terms and conditions of Section 1 of the Primary Policy "as far as applicable."

The Second Excess Crime Policy incorporates certain terms and conditions of Section One of the Primary Policy. Section One of the Primary Policy contains the following language:

(a) General Condition 1(a) provides:

This policy should immediately cease to afford any cover of any kind in the event of the liquidation (voluntary or compulsory) of the Assured, or the appointment of a Receiver or Manager, or the entering into any Scheme of arrangement or compensation with creditors.

(b) General Condition 2 provides:

In the event of a takeover/merger, all premiums and brokerage is deemed fully earned and coverage hereunder should continue until expiry hereof, but only in respect to any loss(es) sustained prior to the effective date of any such takeover or merger.

There are no provisions contained, either directly or by incorporation, in the Second Excess Crime and Excess E & O Policies which provide that the second premium payment must be paid after the policy has been terminated as a result of the appointment of a receiver.

The draft slips explicitly allocate the first premium payment to the period April 22, 1999 to March 31, 2000; and the second premium payment to the period April 1, 2000 to March 2, 2001.

The first premium payments for the Second Excess Crime and Excess E & O policies were paid. The second premium payments on those policies were due to be

made to the London defendants on July 1, 2000, but were not made.

The lead syndicate on the Second Excess Crime Policy was the D.J. Marshall syndicate, and the lead underwriter was William Knapman.

### 4. The Excess E & O Policy

CBL also bought additional errors and omissions coverage in the form of an Excess Bankers Professional Indemnity Insurance, 509/QA539399 (the "Excess E & O Policy") which provided coverage from April 22, 1999 to April 1, 2001. The policy provides $15 million of insurance excess of Section 2 of the Primary Policy (for claims arising out of wrongful acts in the performance of professional services).

The Excess E & O Policy incorporates certain terms and conditions of Section Two of the Primary Policy. Section Two of the Primary Policy contains the following condition:

> In the event of a takeover/merger, all premium and brokerage is deemed fully earned and coverage hereunder shall continue until expiry hereof, but only in respect to any loss(es) sustained, or claim made prior to the effective date of any such takeover or merger.

Section Two of the Primary Policy does not contain a provision equivalent to General Condition 1 of the Section One of the Primary Policy.

The lead syndicate on the Excess E & O Policy was the Marshall syndicate and the lead underwriter was William Knapman.

### 5. The Electronic All Risk Policy

CBL purchased an Electronic Securities and Physical Property Excess Policy, 509/QR029198 (the "Electronic All Risk Policy"), which provided $300 million in insurance excess of $200 million. Although generally in excess of Section 1 of the Primary Policy, as well as the First and Second Excess Crime Policies, the Electronic All Risk Policy does not "follow form" to those policies. Section A (Electronic Securities) insures against the loss or damage to Electronic Securities "held by the Insured in any capacity or for which the Insured is legally liable" from the fraudulent input of data into CBL's computer system and other similar acts. Section B insures against:

> physical Loss of or Physical Damage to Property owned by or in the custody of the Insured whilst upon any premises of the Insured or at any other recognized place of safe deposit or whilst in transit.

Section B provides the traditional "All Risk" coverage that was sold to financial institutions to provide protection for physical loss of or damage to customers' property and securities.

The lead underwriter on this policy was Angus Roberts, from Janson Green, Ltd., underwriting agents for Syndicate 79 at Lloyd's London. Michael Moss was the second lead underwriter.

### Conduct of the Parties

In January of 1998, representatives of three syndicates (Jane Bennett and Chriss Warrior of D.P. Mann, Simon Allport of Ashley Palmer, and David Foster of Janson Green) met with Virginia "Susie" Allen, the director of marketing and administration of CBL, in San Diego, California during an annual meeting of bank risk managers.

In May 1998, Credit Bancorp provided written notice of two separate claims against the Primary and First Excess Crime Policies for the disappearance of Fortune Financial Systems, Inc. ("Fortune Financial") and Colorado Casino Resorts, Inc. ("Colorado Casino") stock certificates from the premises of Citibank, N.A., New

York ("Citibank").[2] In support of each claim, Richard Blech executed and notarized the Proof of Loss filed by CBL. In both instances, Insurers reimbursed CBL for the premiums paid to obtain the sole obligor lost instrument bonds ("LIBs") required by the transfer agents to issue new certificates. Insurers also authorized the issuance of "backup letters of indemnity," whereby Insurers agreed to indemnify and hold CBL harmless, subject to the terms, conditions and limitations of the Primary Policy, against loss which CBL might sustain by reason of the issuance of the LIBs.

Each claim was submitted under Section 1(A), the "Bankers Policy" section, of the Primary Policy and the First Excess Crime Policy. The First Excess Crime Policy follows form to the Primary Policy. General Condition 12, "Fraud," of the Primary Policy provides:

> If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall be void and all claims hereunder shall be forfeited.

These Claims were investigated by the law firm of Pattison & Flannery (London Insurer's defense counsel in this case) and paid under the Primary Policy.

On June 9 and 10, 1998, two of the principal underwriters on the Primary and First Excess Crime Policies (Lance Dalzell–Piper of D.P. Mann and Simon Allport of Ashley Palmer) flew to Geneva and met with Richard Blech, the chairman and CEO of CBL, at the Geneva office of CBL, the purpose of which was to help the underwriters learn more about CBL's business.

On July 9, 1998, Richard Blech and Thomas Rittweger, the managing director of North American operations of CBL, flew to London and met with the underwriters who were considering whether to subscribe to the Electronic All Risk Policy. At the London meeting, Richard Blech told Michael Moss that CBL made money by engaging in "risk free" arbitrage using funds "that they could raise against the stock to trade on behalf of customers."

The Underwriters reviewed the agreements between Douglas Brandon, as Trustee, and the CBL customers related to the credit facility and they represented that Mr. Brandon would be the sole signatory on the account holding the customers' securities and that the customer-deposited securities would be held in trust. Marsh also provided the Insurers with examples of the actual agreements between CBL and the institutions that held CBL's customers' securities as part of the credit facility; those agreements were inconsistent with CBL's representations to customers about the credit facility, and showed that Richard Blech, not trustee Brandon, was the sole signatory on the accounts.

Many of the institutions that acted as depositories were separately insured by Insurers. Though it is not the general practice to do so, Insurers testified that they could have checked with those institutions about CBL but did not.

The underwriters commissioned an investigation of CBL by Robert Bishop, an investigator retained by Lloyd's underwriters to investigate policyholders, who drafted a report on CBL (the "Bishop Report") dated July 27, 1998.

---

**2.** There is some discussion as to which policy the claims were submitted under. If submitted under an "All Risk Securities" Policy as the Receiver suggests, then no claim was made at all under the Primary or First Excess Crime Policies. However, coverage was provided pursuant to the Primary Policy and CBL was aware that coverage was being handled pursuant to the Policies in issue.

Michael Moss and Angus Roberts received the Bishop Report on CBL, and the other Lloyd's underwriters who were considering whether to subscribe to the Electronic All Risk Policy had access to the Bishop Report. Angus Roberts, the Janson Green syndicate's underwriter who was considering whether to subscribe to the Electronic All Risk Policy, also was an underwriter on the Primary and First Excess Crime Policies.

The Bishop Report stated that the insurance policies were being purchased to solve a "marketing problem for CBL" and noted that "the CBL Insured Credit Facility Agreement is silent on whether CBL may use collateral [customers securities] for a corresponding loan arrangement with a foreign bank and how the bank's collateral interest would be established in the securities held by the insured trustee."

In September of 1998, Malcolm Woolgar of the investigative unit of the Corporation of Lloyd's received a report on CBL prepared by an investigator named Michael Lloyd. Woolgar received the report from one of his superiors, Andrew Wragg, whom in turn had received the report from Great Britain's Financial Services Authority (the "FSA"), which was investigating CBL; Andrew Wragg concluded that: "[CBL's insurance] is probably being misstated, and being dressed up to look like FG [a financial guarantee]."

The Lloyd Report provided a brief overview of CBL and stated that the information available "poses more questions that it answers," and stated that "we have severe doubts as to the viability of this organization."

On September 2, 1998, another of Malcolm Woolgar's superiors at the Corporation of Lloyd's, John Baker, spoke to a former director of CBL named Anthony Baron and concluded that "the Company [CBL] was believed to be operating a fraudulent scheme." Baron told John Baker that he had reported CBL to both the Bank of England and to the Irish Banking Authorities. Mr. Woolgar provided the Lloyd Report to Angus Roberts and suggested that the underwriters who had subscribed to the CBL Policies should consider investigating CBL further.

The Lloyd's underwriters then hired Dan McCarthy ("McCarthy") of Bowman Investigations to investigate and report on CBL. McCarthy had worked for the managing agent of the Marshall syndicate, a syndicate that had subscribed to the Primary and First Excess Crime Policies, and that later led the Second Excess Crime and Excess E & O Policies. Archer Underwriting owned Bowman Investigations. McCarthy prepared three reports about CBL (the "Bowman Reports") dated: September 15, 1998; October 8, 1998; and October 28, 1998. In the Bowman Reports, McCarthy reported that "CREDIT BANCORP LTD. and its accomplished international financiers are more of a risk than you were led to believe."

In the Bowman Reports, McCarthy reported to the underwriters who retained him that he had found no evidence that CBL was licensed to conduct business in any jurisdiction. He also noted that CBL claims "to be a leading financial services firm of accomplished international financiers. They do not have them and we have not found them." In addition, McCarthy detailed prior litigation with Mr. Blech's father, Arthur Blech. McCarthy also noted that "we have not yet seen any documentation that leads us to conclude that CBL is a viable, potentially profitable, investment vehicle." McCarthy described his unsuccessful efforts to locate past directors of CBL, and to locate their offices, as well as the offices of CBL affiliates. Dan McCarthy also noted that the Company Fraud Department of the City of Lon-

don Policy currently was investigating CBL.

Michael Moss, an underwriter for the E.E. Patrick syndicate, was concerned about the information contained in the Bowman Reports and considered rescinding the policies in October 1998. Throughout the fall of 1998 and early 1999, Michael Moss and his deputy Graham Hawkins demanded the right to review and make changes to certain CBL business documents, including the following documents:

1) CBL Advertising and Marketing Material,

2) Evidences or Certificates of Insurance,

3) Various CBL Credit Facility Agreements,

4) The CBL Credit Facility Agreement Application,

5) A Form Opinion Letter from CBL trustee Brandon to potential customers, and

6) the CBL Master Securities and Stock Loan Agreements.

On January 6, 1999, Angus Roberts told Malcolm Woolgar, the Corporation of Lloyd's regulator, that "Items of interest did come out of the [Dan McCarthy/Bowman] review. Whilst the items were not indictable on their own [Angus Roberts] and the broker concerned have elected to invite CBL over to give them a presentation on its operations." Angus Roberts told Malcolm Woolgar that the underwriters intended to have an expert on banking regulations present at the meeting with CBL to ask CBL the proper questions.

On February 10, 1999, Richard Blech traveled to London and met with representatives of the Lloyd's syndicates that had subscribed to the CBL policies. On March 16, 1999, Michael Moss' deputy, Graham Hawkins, wrote to Philip Turner of Marsh expressing his concern about CBL and stated:

> Philip, I feel Underwriters have made every effort to understand our assureds needs however I feel we have reached a point where I can no longer allow the insurance coverage we provided to be misrepresented in this manner, unless CBL can come up with the satisfactory responses by the 31st March 1999, Underwriters may have no alternative but to issue notice of cancellation on the policy.

On May 27, 1999, Mr. Moss gave notice that he intended to cancel his syndicate's participation in the Electronic All Risk Policy as of August 1, 1999. Two other syndicates also cancelled their participation at that time. However, the share of the risk that had been borne by the departed syndicates was subscribed to by new syndicates.

The Primary and First Excess Crime Policies required annual resignings, and were resigned in April of 1999. The Insurers also negotiated endorsements to the existing policies during the fall of 1998 and spring of 1999, such as adding coverage for losses arising out of the acts of the trustee, Douglas Brandon. The Insurers also made premium adjustments to reflect changes to the policy limits. The Second Excess Crime and Excess E & O policies were sold to CBL during the spring of 1999. On June 14, 1999, Marsh obtained the actual Primary Policy and First Excess Policies from Insurers and delivered those to CBL, along with cover notes and slips evidencing the other policies.

### The SEC Enforcement Proceeding and Notice Under the Policy

Marsh is designated in the Policies as the entity that is to receive notice on behalf of the Insurers and the Primary Policy states that notice to Marsh "shall be

accepted by the underwriters as notice to the underwriters."

On November 16, 1999, the SEC filed its complaint (the "SEC Complaint") against CBL, Blech, Thomas Rittweger ("Rittweger") and Douglas Brandon ("Brandon"), and sought a temporary restraining order, asset freeze, and appointment of a receiver. The SEC complaint alleges, among other things, that Richard Blech, the former chairman and CEO of CBL, and others, committed fraud which resulted in significant loss of CBL customers' property. The next day, a copy of the SEC complaint was faxed to Marsh & McLellan ("Marsh"), the agent designated by the Insurers to receive notice on their behalf.

On November 18, 1999, a letter was sent by fax from Marsh's New York City office to its London office enclosing a copy of the SEC complaint and stating "[e]nclosed please find correspondence describing a situation which may give rise to a claim under the captioned policy." The Insurers' claim records indicate that the date of loss, as well as notice of loss, took place on November 18, 1999. The SEC Action also was disclosed in an article in the Wall Street Journal on November 18, 1999.

On November 23, 1999, this Court appointed Carl H. Loewenson, Jr. as Fiscal Agent for CBL, Blech and Rittweger. November 23, 1999 Order. On January 6, 2000, the Court appointed Mr. Loewenson as the Receiver, finding that, as Fiscal Agent, Mr. Loewenson did not have:

a) the power to marshall and take control of funds, assets, securities and property owned, held or in accounts in the name or under the control of Credit Bancorp and did not have the other power or authority of a Receiver as set forth in this Order; and

b) ... the power or authority to take custody and possession of the books, records and client information or Credit Bancorp ... or the power or authority to enter into transactions or other business dealings on behalf of Credit Bancorp with third parties; and

c) ... the authority to compel production of documents or other information from third parties who have had communications or business dealings with Credit Bancorp; and

d) ... the power or authority to command or direct employees or agents of Credit Bancorp to perform any acts to assist the Fiscal Agent in the performance of his duties.

January 21, 2000 Order Appointing Receiver at 2–3. The Court also found that more than a month after his appointment as Fiscal Agent, Mr. Loewenson had been unable to obtain all the books and records of CBL relating to the existence and location of assets deposited by customers.

On January 21, 2000 the equity receivership was ordered and the Fiscal Agent was appointed Receiver.

## CONCLUSIONS OF LAW

### The Issues

At issue in the instant motion are the following six items:

1) Whether the Receiver is entitled to summary judgment as to the Insurers' Second and Third Affirmative Defenses, which allege:

All of the Policies contain provisions that terminate coverage in the event of the appointment of a Receiver or Manager. On November 23, 1999 [the Court] appointed Carl H. Loewenson, Jr., Esq. the Fiscal Agent of the Credit Bancorp entities. Accordingly, upon information and belief, all of the Policies were terminated/cancelled on that date.

Second Affirmative Defense

All of the Policies contain provisions that terminate coverage in the event of the

appointment of a Receiver or Manager. On January 21, 2000 [the Court] appointed Carl H. Loewenson, Jr., Esq. the Receiver of the Credit Bancorp entities. Accordingly, upon information and belief, all of the Policies were terminated/cancelled on that date.

Third Affirmative Defense (together, the "Appointment Defenses");

2) Whether either party is entitled to summary judgment as to the Insurers' Seventh and Ninth Affirmative Defenses, which allege:

Upon information and belief, the application for the Policies contained misrepresentations and/or omissions material to the underwriting of the Policies. The Policies are therefore rescinded and void *ab initio.*

Seventh Affirmative Defense

Upon information and belief, Blech incorporated, established and founded Credit Bancorp intending to use that company as a vehicle to defraud its customers; the true nature of [CBL] was misrepresented and concealed by Blech and Credit Bancorp in applying for the Policies, and a fraud was thereby perpetrated upon the [Insurers]. The Policies are therefore void and [the Receiver] is barred from obtaining coverage thereunder.

Ninth Affirmative Defense (together, the "Misrepresentation Defenses");

3) Whether either party is entitled to summary judgment as to the Insurers' Eighth Affirmative defense, which alleges:

Upon information and belief, ... Blech, the sole shareholder, president and chief executive officer of Credit Bancorp, N.V., d/b/a/ Credit Bancorp Ltd., so dominated and controlled Credit Bancorp, its subsidiaries and related companies that he was the "alter ego" of those entities. Therefore there is no coverage under the Policies for losses arising out of any fraudulent, dishonest or wrongful act, omission or conduct of Blech.

(the "Alter Ego Defense");

4) Whether either party is entitled to summary judgment as to the Insurers' Sixth Affirmative defense,[3] which alleges that the earlier submission of two claims under the Policies were fraudulent and therefore voided the Policies (The "Fraudulent Claims Defense");

5) Whether the Insurers are entitled to summary judgment on the issue of whether coverage is provided under the Financial Institutions and Professional Indemnity ("E & O") and the Director Officers Reimbursement ("D & O") Sections of the Primary Policy (the "E & O and D & O Coverage Issue"); and

6) Whether either party is entitled to summary judgment on the issue of whether the Receiver was obligated to pay premiums on the Excess Crime and Excess D & O Policies after the appointment of the Receiver (the "Premiums Issue").[4]

***Governing Law***

General Condition 7 of the Fidelity Portion of the Primary Policy provides that, "[t]he construction, interpretation and

---

**3.** Though the Receiver has not moved for summary judgment as to this defense, this Court is empowered to grant summary judgment in favor of either party. *First Financial Ins. Co. v. Allstate Interior Demolition Corp.,* 193 F.3d 109 115 (2d Cir.1999) ("[A]s long as some party has made a motion for summary judgment, a court may grant summary judgment to a non-moving party, provided the party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried.")

**4.** This related motion was filed separately on July 26, 2000 and marked fully submitted on September 20, 2000 at which time oral argument was heard.

meaning of the terms, exclusions, limitations and conditions of this Policy shall be determined in accordance with the laws of the United Kingdom." Both U.K. and New York authorities are relied upon, and since there is no conflict in controlling law, a determination need not be, and is not, made as to which law applies. *See, e.g. In re Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 937 (1993); *Frutico, S.A. de C.V. v. Bankers Trust Co.*, 833 F.Supp. 288, 296 (S.D.N.Y.1993).

■ However as to "formation" issues such as fraud and, in particular, the Insurers' 7th and 9th Affirmative Defenses, Condition 7 does not apply. By its terms, Condition 7 does not apply to non-contractual misrepresentation claim. Courts have held that contractual choice of law provisions do not bind the parties with respect to noncontractual claims. *Plymack v. Copley Pharm., Inc.*, No. 93 Civ. 2655, 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995) (Wood, J.); *see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir.1996) "Under New York law, a choice-of-law provision indicating that the *contract* will be governed by a certain body of law does not dispositively determine the law which will govern a claim of *fraud* arising incident to the contract."

### The Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### I. The Appointment Defense is Dismissed

■ The termination provision in the fidelity section of the Primary Policy provides, "This policy shall immediately cease to afford any coverage of any kind in the

event of ... the Appointment of a Receiver or Manager." Equating appointment of the Fiscal Agent to appointment of a "Receiver or Manager" under the Policy, the Insurers claim that any claims noticed after November 23, 1999 are not covered because coverage terminated upon the appointment of the Fiscal Agent. It is the Insurers' position that the policies terminated upon the appointment of the Fiscal Agent pursuant to the provisions cited above.

There is no dispute that the Insurers received notice of the SEC complaint against CBL on November 18, 1999, five days prior to the appointment of the Fiscal Agent on November 23, 1999. Further, there is no dispute that the SEC complaint constituted notice of four potential customer claims that were mentioned in the SEC complaint.[5]

Even if the Insurers were correct in their assertion with respect to the appointment of the Fiscal Agent, the defense cannot survive the Receiver's motion for summary judgment because under the terms of the fidelity section of the Primary Policy, notice of the SEC complaint, which contained a description of the circumstances that could give rise to future claims, constitutes notice of all claims based on the same facts. This Court has already held that all of the actual claims for which the Receiver seeks coverage relate to the factual allegations in the SEC complaint. *SEC v. Credit Bancorp, Ltd.,* 93 F.Supp.2d 475, 476 (S.D.N.Y.2000). Thus, the Insurers received proper notice of all claims in issue prior to the appointment of the Fiscal Agent.

The notice provision of the fidelity section of the Primary Policy provides:

> First advise of a loss or claim (or of circumstances which could give rise to a loss or claim) being made by the Assured to their representatives ... shall be accepted by Underwriters as notice to Underwriters.

Notice of each separate claim is not necessary under this provision. Indeed, the existence of a claim is not necessary. Notice of the discovery of a loss, or of circumstances which could give rise to a loss or claim, is sufficient. The fidelity coverage sold to CBL was not written on a "claims-made" basis. Rather, it ties coverage to *discovery* of a loss, or a potential loss, during the policy period, not the *filing* of a claim against the policyholder.

Two attorneys who regularly represent insurers in commercial crime insurance cases have written with respect to a very similar insurance contract provision,[6]

> Because modern fidelity coverages define when a loss is "discovered" as the triggering event which determines the applicable period of coverage and the insured's obligation to provide timely notice to the insurers, the date of discovery is a central question which must be answered in every fidelity claim investigation.
>
> \* \* \* \* \* \*
>
> [T]he discovery provision in the Commercial Crime Policy clearly tie[s] coverage to discovery of possible loss, and do[es] not require actual loss, or knowledge of all the particulars of the loss, in order for discovery to occur.

---

5. These four claims include the Vintage petroleum claim brought by Stephenson Equity Company. This claim is by far the largest and represents approximately 84% of the total loss as measured by the Intervenor Complaints brought against CBL.

6. The policy provision that these commentators refer to provides for the policyholder to give notice to the insurer "after you [the policyholder] discover a loss or situation that may result in loss of, or loss from damage to, Covered Property." *Id.* at 387.

Duncan L. Clore & John Tomaine, *Discovery of Loss, in Handling Fidelity Bond Claims*, at 385, 390 (Michael Keeley & Timothy M. Sukel eds., 1990).

There is no factual dispute that CBL discovered, and then immediately provided notice of, the SEC complaint and its factual allegations prior to the appointment of the Fiscal Agent. The discovery was discovery of a loss or of circumstances that could give rise to a loss or claim. Subsequently filed claims related to that loss or those circumstances are unaffected by the automatic termination-of-coverage provision.

For the reasons stated, there is no genuine issue of material fact as to the appointment defenses. Summary judgment is granted in favor of the Receiver as to the Insurers' second and third affirmative defenses.[7]

## II. The Misrepresentation Defenses Are Dismissed on the Grounds of Ratification

The Insurers' seventh and ninth affirmative defenses allege that the Insurers were induced to sell the Policies by CBL's misrepresentations in the underwriting process.

For the following reasons, the Receiver's motion for summary judgment is granted with respect to the seventh and ninth affirmative defenses. While there may be a factual dispute as to the moment when Blech caused CBL to become primarily fraudulent, any misrepresentations were in effect ratified by the Insurers.

The Insurers contend they are entitled to rescind coverage if the policyholder withholds any fact that would have affected either their decision to underwrite the coverage, or the wording of any of the policy provisions. A misrepresentation or material omission can form the basis of rescission if the prudent underwriter would have wished to take the fact into consideration in deciding whether to accept the risk and, if applicable, how to rate the risk.

■■■ An insurance policy will be void where it is proven that the insured fraudulently concealed a material fact in applying for coverage. *See Sebring v. Fidelity–Phenix Fire Ins. Co.*, 255 N.Y. 382, 385, 174 N.E. 761 (1931); *see also, Sun Ins. Co. v. Hercules Secs. Unlimited, Inc.*, 195 A.D.2d 24, 605 N.Y.S.2d 767, 770 (2d Dep't 1993). The burden of proof on the affirmative defense of misrepresentation is on the insurance company. *Home Ins. Co. v. Spectrum Information Technologies, Inc.*, 930 F.Supp. 825, 835 (E.D.N.Y.1996); *Keck v. Metro. Life Ins. Co.*, 238 A.D. 538, 264 N.Y.S. 892, 893 (4th Dep't 1933), *aff'd*, 264 N.Y. 422, 191 N.E. 495 (1934). The Second Circuit has noted:

> There must be a preponderance of clear and convincing evidence, in order to es-

---

**7.** The Insurers have argued that the Court need not consider the *effect* of the termination of the Policies, but simply the *date* on which they terminated because the 2nd and 3rd Affirmative Defenses merely assert termination/cancellation *dates* and not their *effect*. However, the only impact of the termination date is in relation to the ultimate determination of whether coverage exists under the Policy. The insurers have indicated no other effect of the defense and if they intend that the defense is asserted merely to establish the date of termination with no effect whatever

on the existence of coverage for claims filed after the appointment of the Fiscal Agent, then it is no defense to the claim at all and is stricken as immaterial pursuant to Fed. R.Civ.P. 12(f). Summary judgment is also appropriate since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

tablish fraud, concealment, or misrepresentation on the part of the insured in procuring the insurance ... Such fraud or misrepresentation will not be assumed on doubtful evidence or circumstances of mere suspicion.

*Brayer v. John Hancock Mut. Life Ins. Co.*, 179 F.2d 925, 928 (2d Cir.1950) (citation and quotation marks omitted.) Therefore, on a motion for summary judgment, insurers must provide evidence that could lead to such a determination. The Insurers must also show that the misrepresentations or omissions were made prior to inception of the policy (N.Y. Ins. Law § 3105(a)).

The only affirmative representation by CBL that is identified by the Insurers in their Answer is the unsigned Bankers Blanket Bond "Application". The Declaration Clause of the Application provided that the applicant, CBL, should sign the following:

> We hereby declare that, to the best of our knowledge and belief, the above statements and particulars are true and complete and that we have not suppressed or misstated any material facts. We agree that this application together with any other information supplied to us shall form the basis of any contract of insurance affected hereon and shall be incorporated therein. We undertake to inform insurers of any material alteration to these facts whether occurring before or after completion of the contract of insurance. Signing this application form, however, does not bind the insured to complete this insurance.

No one from CBL signed the application, and the Insurers never asked CBL to complete or sign that document.

The Insurers rely principally on two statements in the 1997 CBL application in which it was written that CBL was a "privately held financial services company"

and its activities included "lending and project management." The Receiver contends that the insurers have not shown that these statements were false. He cites a number of facts from discovery in this case that purport to show that the activities of CBL were fully consistent with these statements. However, as the Insurers correctly point out, on a motion for summary judgment, the Insurers do not need to prove their case, they must merely provide some evidence as to which there is a genuine issue of material fact. The other alleged misrepresentations made in connection with the 1997 underwriting are alleged by Simon Allport, one of the underwriters, who testified that CBL represented to him as "an emerging banking organization which had global aspirations" and testimony by William Knapman. In connection with the 1999 underwriting of the Second Excess Crime and Excess E & O Policies, Knapman testified that it had been represented falsely that there had been no claims under the Primary Policy.

Other alleged misrepresentations cited by the Insurers, for instance that, in Marsh's opinion, CBL was "impeccable", are merely expressions of an imprecise opinion on the part of Marsh and are legally insufficient to support a claim of rescission. *Bronx Savings Bank*, 154 N.Y.S.2d 878, 136 N.E.2d at 850.

The Insurers' principal argument is that CBL was a fraud from its inception and that CBL did not disclose that fact in the 1997 application. The Receiver argues that the Insurers have submitted no evidence establishing that CBL was involved in a fraudulent scheme since its inception or that the fraud was in place at the time that CBL purchased the coverage in 1997.

Relying on the conclusions reached in connection with the appointment of the Receiver, the Insurers argue that the Receiver has offered no evidence that CBL

was ever anything *other than* a fraudulent enterprise that operated as a Ponzischeme. In support of their position, the Insurers point to much of the evidence that the Receiver uses to support his argument that CBL engaged in legitimate business, consistent with the insurance application, arguing that what the Receiver characterizes as legitimate lending activity is actually the *crux* of the Ponzi-scheme. Further, Insurers argue that the remainder of the activity the Receiver attempts to show as consistent with legitimate business is, at the least, fraud-related activity.

■ There is an evidence factual dispute as to when and under exactly what circumstances CBL became a Ponzischeme and whether that preceded or followed the binding of insurance and at what point, if at all, CBL was engaged in legitimate business activity. Furthermore, "the materiality of an insured's misrepresentation is ordinarily a factual question left for the jury's determination". *In re Payroll Express Corp. v. Aetna Casualty & Sur. Co.*, 216 B.R. 344, 357 (S.D.N.Y.1997). However, since the Insurers have ratified the contracts based on uncontroverted conduct after the issuing of the Policies, the misrepresentation defense is unavailing.

In 1998, the Insurers were aware of the following negative information regarding CBL as set forth in the Findings of Fact above:

1. The report of CBL prepared by investigator Michael Lloyd in the summer of 1998, which identified a number of "disturbing facts" and concluded: "we have severe doubts as to the viability of [CBL]"

2. The revelations made to John Baker of the Corporation at Lloyd's. The statements were made by former CBL officer and director Anthony Baron in early September 1998, and included the warning: "[The CBL] scheme would ap-

pear to be intrinsically fraudulent ..." Mr. Baker of the Corporation of Lloyd's concluded that CBL "was believed to be operating a fraudulent scheme."

3. Another investigation of CBL was commissioned in September 1998 by the Insurers, who hired Dan McCarthy of Bowman Investigations. During that investigation, CBL's former director, Anthony Baron, told Bowman Investigations that CBL was misrepresenting to its customers that it was regulated by appropriate authorities and licensed to receive securities. These warnings were conveyed to the Insurers.

4. Based on Baron's statements and other information, Mr. McCarthy gathered on CBL, the Insurers' investigator concluded that there was evidence of suspected fraud.

5. Bowman Investigations issued three reports dated September 15, 1998, October 8, 1998 and October 28, 1998 to Insurers. The Reports revealed that despite its claims, CBL was not licensed to do business in any jurisdiction; the claimed expertise of CBL management did not exist; Mr. Blech and his father were defendants in numerous litigations and one of their companies had been suspended from trading by California regulators; and the Company Fraud Department of the City of London Police was investigating CBL. Bowman Investigations concluded that there was no evidence that CBL was a "viable, potentially profitable investment vehicle" and that CBL was "more of a risk than [the Insurers were led to believe]."

6. The Financial Services Administration of the United Kingdom warned the Corporation of Lloyd's that it was investigating CBL.

7. The Insurers had documents from depository institutions which showed that Mr. Blech was in fact the individual

in control of the accounts into which the customer securities were deposited demonstrating a blatant inconsistency between: (i) CBL's representations to its customers that their securities would be safely maintained in custodial accounts under the control of a third-party trustee; and (ii) the custodial agreements and account statements from various depository institutions used by CBL.

8. Despite the Insurers' repeated requests, Blech refused to disclose any information about his "confidential" European banking contacts who allegedly advanced him substantial funds unsecured by any collateral.

9. The Insurers knew that CBL repeatedly made misrepresentations to customers regarding the scope of insurance.

10. CBL continually refused to make fundamental changes to its marketing documents, contractual agreements, and certificates of insurance demanded by the Insurers.

The Insurers dispute certain of the facts relevant to this issue on the grounds that the Receiver has attributed to the Insurers' collectively, pieces of information that were revealed to individual underwriters or syndicates. For this reason, the Insurers argue, they were not fully aware of the CBL fraud. Importantly, however, there is no dispute that the Insurers were put on notice of evidence indicating fraud by CBL. As the Seventh Circuit noted in *Union Insurance Exchange, Inc. v. Gaul*, 393 F.2d 151 (1968), "knowledge which is sufficient to lead a prudent person to inquire about the matter, when it could have been ascertained conveniently, constitutes notice of whatever the inquiry could have disclosed, and will be regarded as knowledge of the facts." *id.* at 155. There is no genuine issue of fact that the Insurers had knowledge at least "sufficient to lead a prudent person to inquire about the matter." *Id.*, at 155.

Based on these facts, one of the underwriters, Michael Moss, considered recision in the Fall of 1998 and, along with two other syndicates, withdrew his syndicate from the three-year All Risk Securities Policy after less than a year.

■ Despite the fact that each section of the Policy at issue contained a non-cancellation clause, there is no dispute that the Policies could have been rescinded based on a revelation that there was fraud in the underwriting. The Insurers point out that they could not rescind the Policies and, effectively, close CBL's operations, barring compelling reasons. *See* Jack C. Stern, *Post–Loss Rescission of Insurance Coverage*, N.Y.L.J., April 18, 1994 at A1. However, evidence of fraud as existed here is sufficient. The Insurers were entitled to rescind their policies in 1998, when they learned that CBL was not regulated and was not a viable entity, and were explicitly warned that there was evidence of fraud. Since they chose not to, they are deemed to have ratified the Policy.

■ A finding of ratification will defeat even a valid claim of misrepresentation where the party seeking to avoid the contract does not take prompt action after discovery of the alleged false statement. When determining ratification, the key factors are "whether [the] party silently acquiesced in the contract or rather promptly interposed his objections upon discovering the basis for the claim of rescission." *Prudential Ins. Co. v. BMC Indus., Inc.*, 630 F.Supp. 1298, 1302 *citing Sheindlin v. Sheindlin*, 88 A.D.2d 930, 450 N.Y.S.2d 881 (2d Dep't 1982). *See also, Grubel v. Union Mutual Life Ins. Co.*, 54 A.D.2d 686, 387 N.Y.S.2d 442 (2d Dept' 1976) (affirming summary judgment based on finding that a party ratified the agree-

ment by accepting benefits under its express terms for more than two years without objection.) Here, however, there has been significant discovery and there can be no dispute that the "basis for [a] claim of rescission" was present in the information provided to Insurers. With that knowledge, Insurers retained the premiums,[8] negotiated endorsements,[9] redrafted CBL marketing and business documents,[10] and engaged in annual re-signings of the Policies.[11] They delivered the Policies in the summer of 1999, and the Second Excess Crime and Excess E & O Policies also were sold to CBL during the Spring of 1999.

The Insurers assert that defenses relating to the existence of coverage are not waivable because a court cannot create coverage where none exists. For this principle, Insurers rely on *Powers Chemco, Inc. v. Federal Ins. Co.*, 122 A.D.2d 203, 504 N.Y.S.2d 738, 739 (2d Dep't 1986). As pointed out by the Insurers, that case holds that "any defenses which relate to the issues of coverage or non coverage are not waivable, because the courts will not create coverage where none otherwise exists." *Id.*, at 739 (*citing, Albert J. Schiff Associates, Inc. v. Flack*, 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417 N.E.2d 84). The Insurers insist that this holding applies explicitly to the facts of this case.

In *Powers Chemco*, however, a policyholder sought coverage from its comprehensive general liability carrier for environmental cleanup costs, and the insurer responded by issuing a reservation of

rights letter enumerating a variety of defenses to coverage. The policyholder sued, and the defendant insurer pleaded affirmative defenses that it had failed to include in its reservation of rights letter. These defenses claimed that there was no coverage under the policy for the type of environmental claims at issue. The policyholder moved to strike on the grounds of waiver. The court denied the motion, reasoning that courts will not create coverage where none otherwise exists. Therefore, *Powers Chemco* stands only for the conclusion that the claimant could not expand the *type* of coverage afforded through the policy through waiver. This position was espoused in *Burt Rigid Box, Inc. v. Travelers Prop. Casualty Corp.*, 126 F.Supp.2d 596 (W.D.N.Y.2001) which distinguished *Albert J. Schiff Associates, Inc. v. Flack*, 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417 N.E.2d 84 (the case cited by the court in *Powers Chemco* for the relevant proposition) for similar reasons. The court stated, "a careful reading of [*Schiff*] reveals that although [it] holds that failure to disclaim will not create coverage that is not otherwise provided for, [it does] not support the proposition that a dispute over whether an insurance policy was ever issued negates the putative insurer's obligation to disclaim based on untimely notice of an occurrence." *Id.* at 632 "[I]t does not follow under New York law ... where at issue is not whether a particular policy specifically provided for the *coverage sought*, but whether a particular policy was *ever issued*, an insurer is not required to timely disclaim." *Id.* at 633 There, as

---

**8.** The Insurers also made premium adjustments to reflect changes to the policy limits.

**9.** Coverage for losses arising out of acts of the trustee, Douglas Brandon, was added during this period.

**10.** Throughout the fall of 1998 and early 1999, Michael Moss and his deputy, Graham

Hawkins, demanded to review and make changes in a number of CBL business documents.

**11.** The Primary and First Excess Crime Policies required annual resignings, and were resigned in April of 1999.

here, the issue is not the *coverage sought*, but whether the policy was ever validly entered into. Here, as the Receiver's fidelity claims are of a type plainly within the coverage grant of the Policies, a finding of ratification by the Insurers would not result in any expansion of policy coverage.

The Insurers also argue that, despite all of the negative information on CBL in their possession, they were entitled to rely on the broker, Marsh. However, there is no basis for the Insurers to argue that they can delegate underwriting decisions to the broker. Moreover, there is no evidence that the Insurers shared with Marsh the results of their various investigations on CBL and there is evidence that they intentionally kept the results of the Bowman Investigation from reaching the broker.

As previously stated, part of the Insurers' objection to the ratification and waiver arguments is that there were a number of policies and not all of the underwriters on each policy were aware of all the negative information. However, two of the policies (Primary and First Excess Crime) were sold as a package and were subscribed to by the same underwriters. Two of those underwriters, Angus John Roberts and William Knapman, led the other three policies at issue: the Second Excess Crime, the Excess E & O, and the All Risk Electronic Securities Policies. Thus, each of the policies had subscribing syndicates that also subscribed to the other policies at issue.

Even though there is a material issue as to whether and up to what point CBL engaged in legitimate business activity, the Insurers' rescission claim fails because of their conduct in 1998, when they failed to rescind the Policies and thereby ratified the existing coverage and the additional policies which were sold after grounds for

rescission were established. For this reason, the Insurers' seventh and ninth affirmative defenses are dismissed and their related cross-motion for summary judgment is denied.

### III. The Alter Ego Defense is Stricken

The Insurers' eighth affirmative defense is based on the allegation that Blech is the "alter ego" of CBL such that CBL could not govern or alter his misdeeds. As stated in the description of the policies, the Primary Policy states that "losses resulting from the dishonest or fraudulent acts by Employees of the Assured will be covered." The Primary Policy defines an Employee as "the Assured's *officers*, clerks, servants, and other employees while employed by the Assured." It is undisputed that Blech was an officer of CBL; thus, under the terms of the Primary Policy, he met, at least nominally, the definition of an Employee. Finally, the Primary Policy, by its terms, does not require that, for a person to be an Employee of CBL, CBL must have the right to govern and direct the individual in question. The issue of imputing that meaning into the contract has been raised by the Insurers.

The real issue is whether "Employee" as it is defined in the Policy covers Blech. According to the Receiver, as a matter of the plain language of the contract, Blech is covered. The Insurers contend that although the Policy definition of "Employee" covers "officers", Blech himself is not covered because he so dominated and controlled CBL that he was the "alter ego" of CBL.

An alter ego defense depends on the language of the insurance contract. "[It] is not a common law defense; rather it is a defense derived from *the language*

*of the policies themselves."* Bird v. Cent. Ins. Co., 11 F.3d 228, 232, n. 6 (1st Cir. 1993).[12] The definition of *Employee* in CBL's Policies does not require that CBL have the right to "direct and govern" the employee; nor does it exclude certain employees from coverage even if they controlled CBL.

Payroll Express Corp. v. Aetna Casualty & Surety Co., 216 B.R. 344 (S.D.N.Y. 1997), aff'd, 186 F.3d 196 (2d Cir.1999), cert. denied, 529 U.S. 1019, 120 S.Ct. 1419, 146 L.Ed.2d 312 (2000) *"Payroll"*, cited by the Insurers as support for their alter ego theory (Ins. Br. at 61–63), demonstrates that the presence of the "govern and direct" language in the policy is critical to the contractually based alter ego argument. In that case, the court expressly rejected the same equitable alter ego argument that the Insurers advance here, holding that the corporate principals who had looted the company were not the equitable alter egos of the corporation, and that the corporate form should not be disregarded on equitable grounds. 216 B.R. at 361. Relying only on the policy definition of "employee," which contained the "govern and direct" language, the court held that one of the defalcating corporate principals who held a position of control was not an "employee". *Id.* at 363.

Other courts that have faced this issue have concluded that, where the terms of an insurance policy do not require that an individual be subject to the direction and governance or control of the corporate policyholder in order to qualify as an "employee," an insurance company cannot be heard to argue that an officer who held a position of control is not an employee of the policyholder. *See, e.g., FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 482 (9th Cir.1991) (*New Hampshire* ); *Shields v. Nat'l Union Fire Ins. Co.*, Nos. 90–0985S, 91–1090S, 1992 WL 236162, at *7 (Bankr.E.D.Pa. 1993); *Employers Reinsurance Corp. v. Landmark*, 547 N.W.2d 527, 539 (N.D. 1996).

Courts have refused to afford fidelity coverage to a corporation pursuant to an alter ego defense only where the policy language explicitly excludes coverage for the misdeeds of persons whom the insured corporation does not have the ability to "govern and direct." *See, e.g., Kerr v. Aetna Cas. & Sur. Co.*, 350 F.2d 146, 154 (4th Cir.1965); *Payroll*, 216 B.R. 344 (S.D.N.Y. 1997), aff'd, 186 F.3d 196 (2d Cir.1999), cert. denied, 529 U.S. 1019, 120 S.Ct. 1419, 146 L.Ed.2d 312 (2000); *California Ins. Co. v. American Diversified Sav. Bank*, 948 F.2d 556 (9th Cir.1991); *In re World Hospitality Ltd.; Tow v. Wohl*, 983 F.2d 650 (5th Cir.1993).

In *In re Lloyd's Securities, Inc.*, 1992 Bankr.LEXIS 1452 (E.D.Pa. Sept. 17, 1992), report and recommendation approved and adopted, 153 B.R. 677 (E.D.Pa. 1993), the sole directors, officers, and principals of the insured corporation, a securities brokerage firm, engaged in an extensive scheme of embezzlement. The SEC initiated an action against the company, and a trustee was appointed to liquidate the business. The trustee sought recovery under a fidelity bond for the acts of the two individuals. The bond defined "employee" as:

---

**12.** The First Circuit, in *Bird*, found that the explicit policy language at issue in that case provided for an alter ego defense, but noted, "Where the intention of the parties as to who are employees is expressed in a fidelity policy, that intention will be given effect." Here the parties agreed that, inter alia, only those natural persons "whom the insured ... has the right to govern and direct in the performance of [their] service" would be " 'employees' covered by the Policies." *Id*, at 232. *Citing* 13 Ronald A. Anderson and Mark S. Rhodes, Couch on Insurance 2d, § 46:25 at 33 (1982).

(1) an officer or other employee of the Insured while employed in, at or by any of the insured's offices or premises covered thereunder,

\* \* \* \* \* \*

(9) any natural person who is a partial owner of the Insured when such natural person is performing acts coming within the scope of usual duties of an officer or an employee of the Insured . . .

*Id.* at \*16–17. At issue was whether Lloyd (one of the dishonest officers) was an "employee" covered under the terms of the policy. The court held that he was, noting that there were no exclusions for officers occupying a position of control, and that he qualified as an "employee" by virtue of the policy's definitional sections quoted above. *Id.* at \*17–19. The court concluded its analysis by noting: "If the [Insurers] meant to exclude either Lloyd or Nachmann from the scope of coverage, it clearly could have done so by expressly excluding them from coverage by name." *Id.* at \*19. *See also, FDIC v. USAFORM Hail Pool, Inc.,* 318 F.Supp. 1301 (M.D.Fl.1970), *affirmed in relevant part and vacated and remanded in part,* 463 F.2d 4 (5th Cir. 1972) (holding that even though the dishonest CEO was determined to be the "alter ego" of the insured corporations, he was determined to be an "employee" under the terms of the bond since the bond expressly covered him and coverage under the policy attached.); *General Finance Corp. v. Fidelity and Casualty Co.,* 439 F.2d 981 (8th Cir.1971) holding that a controlling shareholder who misappropriated funds was an "employee" where the limiting "govern and direct" language in the policy was taken out, stating "[i]f majority

stock ownership was thought to pose an unacceptable hazard, the insurer could have inserted a provision in the policy concerning stock ownership." *Id.,* at 981.

In *New Hampshire,* the FDIC, in its capacity as a receiver for a failed savings and loan institution, sued New Hampshire Insurance Company, which had sold a fidelity bond to the savings and loan, in order to recover losses that had been sustained due to the fraudulent or dishonest acts committed by the savings and loan's former president, director and sole shareholder. 953 F.2d at 480. The fidelity bond's definition of "employee" in *New Hampshire* (like that in CBL's) did not include "govern and direct" language. *Id.,* at 482. The Ninth Circuit held that the savings and loan's former president, director and sole shareholder *was* a covered employee and distinguished cases where "the courts were concerned with a special limitation on the definition of the term 'employee' not present in this matter." *Id.,* at 482.[13]

The Insurers have contended that rather than follow the opinion of the Ninth Circuit in *New Hampshire,* which involved very similar (though as the Insurers correctly point out not *exactly* the same) language, this Court should follow the "reasoning" of the Fifth Circuit in *In re World Hospitality, Ltd.; Tow v. Wohl,* 983 F.2d 650 (1993) which dealt with a policy that included "govern and control" language. Insurers seek to emphasize the policy considerations that the Fifth Circuit considered in *Wohl.* The court stated, "Allowing the corporation to recover for its own fraudulent or dishonest conduct would essentially allow the corporation to recover

---

**13.** The cases distinguished by the Ninth Circuit in *New Hampshire* on the basis of the fact that the policies at issue included "govern and control" language are cases relied upon by Insurers in their brief. They are: *Kerr v.* *Aetna Casualty and Surety Co.,* 350 F.2d 146 (4th Cir.1965); and *Three Garden Village Ltd. Partnership v. United States Fidelity & Guaranty Co.,* 318 Md. 98, 567 A.2d 85 (1989).

for its own fraudulent or dishonest acts." *Id.* at 652.

However, as the Seventh Circuit has pointed out, "[The] wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out [where the owner and controlling shareholder of the corporations] has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene." *Scholes v. Lehmann,* 56 F.3d 750, 754 (1995).

The Insurers rely on cases that involve fidelity bonds which define an "employee" as, *inter alia,* one whom the insured has the "right to control". The Insurers contend there is no logical reason why the same result should not be obtained in this case as in the instances where the "right to control" language exists.

However, if the terms of an insurance contract are clear and unambiguous, a court must enforce the plain, ordinary, and common meaning of those terms. *See American Home Products Corp. v. Liberty Mutual Ins. Co.,* 565 F.Supp. 1485 (S.D.N.Y.1983), *aff'd,* 748 F.2d 760 (2d Cir. 1984); *State Farm Mutual Auto. Ins. Co. v. Bentley,* 262 A.D.2d 739, 691 N.Y.S.2d 603, 604 (3d Dep't 1999). Here the terms are clear and unambiguous—"employee" is defined to include an "officer" without limitation to whether the corporation had the right to govern or control such officer, and Blech was an officer. The Insurers wish to rewrite the policy to include the "govern or control" language as a "logical" exten-

sion of the nature of the risk insured by such fidelity coverage.

From their citation to other fidelity policy language that contains the "govern and direct" requirement, the Insurers were well aware that they could have used a definition of "employee" that would have excluded Blech. Courts enforce the plain and ordinary meaning or terms in insurance policies and having drafted the policy language without a "govern and direct" requirement, the Insurers must live with the policy language they wrote. *See American Home Products Corp. v. Liberty Mutual Ins. Co.,* 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), *aff'd* 748 F.2d 760 (2d Cir. 1984).

Accordingly, the alter ego defense fails as a matter of law and is stricken as legally insufficient pursuant to Rule 12, Fed.R.Civ.P.[14]

### IV. *The Fraudulent Claims Defense Must Be Tried*

▆ The sixth affirmative defense seeks to void the Policies because prior fraudulent claims are alleged to have been submitted by CBL.

The substance of the Insurers' defense is that both the Fortune Financial and the Colorado Casino claims were fraudulent and pursuant to Condition 12 of the Primary Policy quoted above, the Policies were voided. Insurers, by way of cross-motion, have sought summary judgment on this point, and the Receiver in his reply seeks the same. Because there exist disputed issues of material fact with respect to this defense, the motions for summary judgment are denied.

---

14. The defense would fail on summary judgment in any case since the Insurers have offered no evidence that shows that the parties intended to exclude from coverage losses arising out of the dishonest or fraudulent acts of officers of CBL or persons who exercised

control over CBL. The only evidence cited is an e-mail from James Hall, a Marsh broker, which is at best inconclusive (and contradicted) and is inadmissible in any case as a violation of the parol evidence rule.

An insurer that asserts an affirmative defense as a bar to a cause of action has the burden of proving all the essential elements necessary to that defense. *Deitsch Textiles, Inc. v. N.Y. Prop. Ins. Underwriting Ass'n*, 62 N.Y.2d 999, 479 N.Y.S.2d 487, 468 N.E.2d 669 (1984); *Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 639 (2d Cir.1995); *Fiorillo v. Cent. Ins. Co.*, 267 A.D. 220, 46 N.Y.S.2d 108, 110 (3d Dep't 1943); *O'Connell v. Pearl Assurance*, [1995] 2 Lloyd's Rep. 479, 480 (Otton, J.). For purposes of summary judgment, the Insurers must establish that the following facts are undisputed: (i) that the Colorado Casino or Fortune Financial certificates were not lost; (ii) that CBL submitted a materially false claim with an intent to defraud them;[15] and (iii) that the prior claim was submitted under the Primary and First Excess Crime Policies.

In *Deitsch*, the policyholder failed to offer evidence to substantiate proof of loss. However, the court still rejected the affirmative defense of fraud because the insurers failed to meet their burden of proof. *Id.* at 670.

CBL submitted the claim for lost Colorado Casino shares on establish that (i) the shares were not lost, but sold, and (ii) CBL an intent to defraud the Insurers at the time the claim was made.

The Insurers first rely on Richard Blech's February 19, 1998, letter to Douglas Brandon, which states that the Colorado Casino stock was not lost or stolen. The Insurers argue that this letter is inconsistent with the May 8, 1998 claim that the securities were lost. However, up until May 8, 1998, existing evidence supports the conclusion that both CBL and the own-er of the shares, Double Eagle, were in the possession of Citibank. It was not until May 8, 1998 that CBL submitted the claim that the Colorado Casino shares were lost. Evidence of Blech's knowledge or belief in February that the certificates were in the possession of Citibank does not conclusively establish his knowledge or belief three months later in May that they were not. The evidence is equally consistent with both.

The Insurers also rely on the affidavit of Keith Whyte, the manager of the Receives and Delivers Department at Citibank, affirming that the Colorado Casino shares were transferred out of Citibank on May 13, 1998 to a bank in Europe. Mr. Whyte's Affidavit was signed on August 19, 1998—six months after Blech's February 19, 1998 letter, and more than three months after CBL submitted its claim to the Insurers.

The Whyte Affidavit does not identify who ordered the transfer of shares out of Citibank and the Insurers admit that they have not yet uncovered who instructed Citibank to transfer the Certificates. The Whyte affidavit alone does not establish that the Colorado Casino certificates were sold rather than lost.

On a different theory of the disposition of the Colorado Casino and Fortune Financial shares (that rather than having sold the shares to unknown third parties, CBL *knew* that the securities were in the possession of United European Bank ("UEB")), the Insurers rely principally on a letter from UEB, dated June 5, 1998 (the "June 5, 1998 Letter"), allegedly sent to

---

**15.** *Fine v. Bellefonte Underwriters Ins. Co.*, 589 F.Supp. 438 (S.D.N.Y.1984), *aff'd*, 758 F.2d 50 (2d Cir.1985). However, intent may be inferred from an insured's knowingly submitting a false claim. *See, Sunbright Fashions, Inc. v. Greater N.Y. Ins. Co.*, 34 A.D.2d 235, 310 N.Y.S.2d 760 (1st Dep't 1970), *aff'd*, 28 N.Y.2d 563, 319 N.Y.S.2d 609, 268 N.E.2d 323 (1971) (where conduct precluded mistake, intent sufficient to void the policy was established); *Carlin v. Crum & Forster Ins. Co.*, 191 A.D.2d 373, 595 N.Y.S.2d 420 (1st Dep't 1993).

Richard Blech, which states that UEB asserts possession of the Colorado Casino and Fortune Financial certificates adverse to CBL, as part of an effort to coerce CBL into resolving a dispute regarding different shares. The letter reads in pertinent part:

Since May 28, 1998, we have proceeded with the purchase of the outstanding [Colorado Casino] open short position. As of today, we have sustained a loss which amounts to USD 2,535,931.22 and we hereby demand that you pay such amount to us immediately. Please further be advised that we will continue to retain possession of [Colorado Casino] stock certificates No. 4809 and 4810 for 950,000 shares each, and of [Fortune Financial] stock certificate No. 1576 for 1,000,000 shares until such time as you compensate us for all damages you caused us.

The Receiver argues that the June 5, 1998 Letter does not mean that UEB had "physical possession" of the shares as a matter of undisputed fact. In his argument, the Receiver asserts that the claim in the letter that "we" will maintain possession of the securities just as likely reflects an assertion of UEB that Citibank would maintain physical control over the shares subject to UEB's instructions since there is evidence that the securities had been placed with Citibank for deposit to UEB's account. Such an assertion by UEB need not contradict Blech's belief that the shares were still at Citibank, but that Citibank could not account for them.

Based on these conflicting explanations of factual submissions, there is clearly an issue of material fact to be resolved with respect to the Insurers's fraudulent claims defense. Summary judgment is therefore inappropriate.

## V. The Insurers' Motion for Summary Judgment to Dismiss the E & O and D & O Coverage Claims is Denied

The Insurers seek summary judgment dismissing the claims made under the Financial Institutions Professional Indemnity Coverage ("E & O") and the Directors and Officers Reimbursement ("D & O") Sections of the Primary Policy.[16] Because these Sections of the Primary Policy do not exclude all non-negligent conduct and the proof may in any case reveal negligent, non-fraudulent conduct on the part of CBL officers and directors, the motion is denied.

In support of their motion for summary judgment, the Insurers contend that all losses arising out of any intentional conduct, such as breach of fiduciary duty, are excluded by the definition of "Wrongful Act" in the E & O and D & O Sections of the Primary Policy. The Receiver and Messrs. Rittweger and Brandon responds that the definition does not exclude non-negligent conduct and, in any case, there are independent claims of negligence under which claims have been made.

The term "Wrongful Acts" is defined in the E & O Section as: "any actual or alleged error, omission, or negligent act in rendering or failing to render professional services." In the D & O Coverage Section, "Wrongful Act" is defined as: "any actual or alleged error, omission, misstatement, misleading statement, neglect, breach of duty or negligent act."

The Insurers' rely principally upon Wimpey Construction UK Ltd. v. Poole, [1984] 2 Lloyd's Rep. 499, 514 ("Wim-

16. Douglas C. Brandon ("Brandon") and Thomas M. Rittweger ("Rittweger") have filed briefs in opposition to the Insurers' summary judgment motion on the issue of the D & O coverage as it pertains to them. As the analysis for coverage under both the D & O and E & O Coverage is the same, they are treated together.

264

pey"). In *Wimpey,* the relevant clause provided coverage for an "omission, error, or negligent act." *Id.* at 513. In *Wimpey,* no third party claims had been asserted against the policyholder. Rather the construction division of Wimpey sought insurance for the remedial cost of strengthening a wall which it had built pursuant to plans drawn up by the design division of Wimpey. The plans, apparently, did not take into consideration the softening nature of the clay soil. The court noted that the policy was not limited to losses arising out of negligence.

> A professional indemnity policy does not necessarily cover only negligence. In my view I must give effect to the literal meaning of the primary insuring words and construe them so as to include any error or omission without negligence. .
>
> But not every loss caused by an omission or error is recoverable under the policy. In the first place, which is common ground, it must not be a deliberate error or omission.

[1984] 2 Lloyd's Rep. at 514. However, the issue in the case was the application of Clause 12 of the policy which extended coverage to first-party losses by a division of Wimpey "as if a claim had been made." The court found that there could be no claim within the corporation and therefore, there was no coverage under Clause 12. *Id.* In contrast, there are present claims asserted by the Customer-intervenors against CBL for negligence and breach of fiduciary duty and those claims are covered. As stated by Rittweger, there is a universe of non-negligent errors and omissions that is covered. Moreover, the court in *Wimpey* did not confront the existence of a specific exclusion for intentional acts as exists in the CBL Policy.

The Insurers also rely on *Davies v. Hosken,* [1937] 3 All E.R. 192 and *Goddard & Smith v. Frew,* [1939] 4 All E.R.

358, for the proposition that policies such as those at issue in this case are not intended to cover intentional conduct. However, as the court noted in *Wimpey,* "[Those] cases ... do not, however, in my view support the proposition that they have 'laid down that such policies are intended to cover negligence' if those words are to be taken as meaning 'to cover only negligence.'" At 513. Both of those cases dealt with the issue of whether fraud was covered by the policy provisions. That is not the issue in this case. Since fraud is specifically excluded under Exclusion E, the only issue is whether non-excluded, non-negligent conduct is covered by the E & O and D & O Provisions of the Primary Policy. It is.

CBL's E & O Coverage specifically excludes losses arising out of only certain intentional conduct such as libel, slander, defamation, (Exclusion A), or any dishonest, fraudulent, or criminal act or omission (Exclusion E). There would be no need for these specific exclusions if all intentional acts were excluded by the "Wrongful Act" definition. As one court has found with respect to similar policy language, "[t]he presence of these exclusions covering specific types of intentional conduct suggests [the insurance company] understood other types of intentional misconduct to be covered by the policy." *Independent School District No. 697, Eveleth, Minn. v. St. Paul Fire & Marine Ins. Co.,* 515 N.W.2d 576 (Minn.1994)

Therefore, the definition of "Wrongful Acts" covers non-negligent conduct not specifically excluded under the terms of the Policy.

**Losses Under the Policy Arise, At Least In Part, From Wrongful Acts Not Specifically Excluded From Coverage**

█ The coverage sold to CBL specifically contemplates the possibility that the adverse consequences of one person's dis-

honest or fraudulent conduct which is specifically excluded in the Policy may be intertwined with another's non-dishonest conduct. Exclusion E provides:

> Underwriters shall not be liable for loss
> ...
>
> \* \* \* \* \* \*
>
> E. brought about or contributed to in fact by any dishonest, fraudulent or criminal act or omission by any of the Assureds, ... provided, however, no Wrongful Act shall be imputed due to any other person for the purpose of determining the applicability of Exclusion E.

The D & O Section of the Policy contains a similar provision and provides in Exclusion G that "[n]o Wrongful Act shall be imputed to any other person for the purpose of determining the applicability of Exclusion G and H."

The Insurers' contend that any claims of negligent, non-fraudulent conduct on the part of any CBL employee other than Blech would necessarily arise from that person's failure to uncover or prevent Blech's fraud. Even if that is true, it is irrelevant. The Receiver and Messrs. Rittweger and Brandon do not challenge this "but for" analysis. There can be no dispute that but for the alleged fraud by Blech, there could be no negligent failure to discover it. However, the last sentence of the specific exclusion for dishonesty and fraud (Exclusion E in the E & O Coverage and Exclusion G in the D & O Coverage) expressly states that the exclusion does not apply to persons other than the dishonest actor. Under the Insurers' reasoning, if there has been an instance of dishonesty or fraud, Exclusion E bars coverage for all losses arising out of related negligent, non-dishonest conduct. That would render the non-imputation clause of Exclusion E meaningless. The language in the Policy contemplates a different cau-sation analysis. If another director, officer or employee was negligent, his negligence was independent of Blech's fraud. In other words, such negligence or recklessness was not "brought about by or contributed to by" the fraudulent conduct.

In 1960, an Australian appellate court, applying the law of the United Kingdom, addressed a similar issue. The Court rejected the Insurers argument that the alleged wilful and deliberate conduct of the employee should be imputed to the employer. The court held:

> [A]n employee's omission may be actuated by some mental element which makes it fraudulent, deliberate or intentional; but it does not follow that the same element is to be taken as having actuated the company if it is otherwise liable for the omission. In other words, the intent of the employee is not necessarily to be imputed to the company as his employer.
>
> The plea in the present case alleges that an employee or employees of the plaintiff wilfully and deliberately failed to effect a policy of insurance ... So far as the [employer] is concerned, therefore, the plea is consistent with a mere failure by the company to effect the policy, and such a failure, as I have said, would be an error of omission of the assured within the scope of the policy.

*Simon Warrender Proprietary, Ltd. v. Swain* 111, 116.

If the trier of fact were to determine that one officer fraudulently, but that another director, officer or employee acted E & O coverage for losses arising in part out of their conduct would of the customer claims against CBL allege negligence or breach of fiduciary duty as an independent basis for liability. Therefore,

Insurers are not entitled to summary judgment on either the E & O Provision

Policy or the D & O Provision of the Primary Policy.

## VI. *Receiver's Motion for Summary Judgment on the Issue of Premium Payments is Granted*

 As discussed in the facts section, above, the Second Excess and the Excess E & O Policy follows form to Section 2 of the Primary Policy. In contrast to the two Excess Policies, the premium on the Primary Policy was paid entirely at the inception of the Policy. The first payment on the Excess Policies was due April 22, 1999. The second payment would have been due July 1, 2000. Since there are no terms in the Excess Policies regarding the payment of a premium in the event of the appointment of a Receiver, any argument that the second premium is due after termination must be based on incorporation from the Primary Policy. The Insurers' position is that language of the Excess Policies require that a single premium be paid in "installments."

Section 1 of the Primary Policy, to which the Second Excess Crime Policy follows form, contains two relevant clauses. General Condition 1 of Section 1(A) provides:

> This Policy should immediately cease to afford any cover of any kind in the event of the liquidation (voluntary or compulsory) of the Assured, or the appointment of a Receiver or Manager, or the entering into any Scheme of Arrangement or compensation with creditors.

General Condition 2 provides:

> In the event of a takeover/merger, all premiums and brokerage is deemed fully earned and coverage hereunder should continue until expiry hereof, but only in respect to loss(es) sustained prior to the effective date of any such takeover or merger.

Section 2 of the Primary Policy, to which the Excess E & O Policy follows form, contains only one relevant clause. Section VII.C, General Conditions—Cancellation Clause provides that:

> In the event of a takeover/merger, all premiums and brokerage is deemed fully earned and coverage hereunder should continue until expiry hereof, but only in respect to loss(es) sustained prior to the effective date of any such takeover of merger.

Section 2 of the Primary Policy also includes a definition of a "receiver." That definition is not included in Section 1 and structure of the Primary Policy, which is divided in three distinct indicate or suggest that such definition should apply in a section

The Insurers rely on the definition contained in Section of the to argue that the "takeover/merger" clauses in both sections of the Primary Policy control the premium payments issue both of the Excess Policies. This contention requires that two separate the Primary Policy, be rewritten into a single provision that

General Condition 1 deals with the appointment of a or "Manager" and provides that upon such appointment, the takeover/merger, and provides that upon such event, all premiums dealt with in two separate provisions suggests that they are not to

Insurers argue that even though the Primary Policy was terminated upon the appointment of a Receiver, the Receiver should pay the second premium payments for the Excess Policies because such policies follow form to the "takeover/merger" clauses quoted above. However, the Excess Policies only follow form to the terms and conditions of the Primary Policy "as far as applicable". The Primary Policy requires the payment of a single premium for a three year period at the inception of

the policy. The Insurers have made no showing that the premium provision of the Primary Policy is "applicable" to the Excess Policies each providing for two premium payments to cover different time periods.

The Insurers' reliance on *Home Insurance Co. v. American Home Products Corp.*, 902 F.2d 1111, 1113 (2d Cir.1990), for the proposition that the obligations of a following form excess insurance policy are defined by the language of the underlying policy is misplaced. In *Home Insurance,* the excess policy followed form to the underlying policy "except as otherwise provided" in the excess policy. *Id.* at 1113. The Second Circuit found that the excess policy did not follow form, because both the underlying and excess policies contained their own provisions regarding the dispute. *Id.* at 1114. More importantly, the follow form language in *Home Insurance* differs from that found in the Excess Policies in this case which provides that they follow form "as far as applicable." Thus *Home Insurance* does not support the proposition the premiums provision in the CBL Primary Policy must be read into the Excess Policies.

Here, the provisions of the Primary Policy are not "applicable" arrangement set up in the Excess Policies. The Excess Policies do of premiums.

Since employed in the Primary Policy provide for a single payment for a multi-year payment is calculated to correspond to 343 days of coverage and the corresponds to an entire 365 day annual period, the premiums apply "installment" does not indicate otherwise because it is consistent

■ Where a policy or contract of insurance is lawfully terminated by either party, the liability of the policyholder for further premiums ceases. *Massachusetts Bonding & Ins. Co. v. Harrisburg Trust Co.*, 24 F.Supp. 269, 270–71 (M.D.Pa.1938);

5 Mills Holmes, *Appleman* § 24.4 (1999) ("Once a policy period thereafter"); 2 Lee R. Russ, *Couch on Insurance 3d* (1997) ("[W]hen a policy is effectively cancelled, the insured is not liable for further premiums which would become due thereafter"); 45 Lawrence J. Culligan, *Corpus Juris Secundum Insurance* § 450(b) (1993). As the New York courts have held:

> A premium is paid the surety as compensation for assuming liability, but where the liability no longer exists there can be no reason for thinking the parties contemplated a continuation of its payment.

*National Surety Co. v. Stallo,* 156 N.Y.S. 988, 990, 171 A.D. 206, 210 (1st Dep't 1915).

Therefore, no payment is due with respect to the second policy period since the coverage was terminated by the appointment of the Receiver prior to the date the payment would have been due.

### *CONCLUSION*

For the reasons stated, the Receiver's motion for partial summary judgment is granted with respect to the Appointment Defenses, the Misrepresentation Defenses, the Alter Ego Defense and the Premiums Payment Issue. The Insurers' cross-motion for partial summary judgment is denied.

It is so ordered.